2016 IL App (1st) 132357

FIRST DIVISION
January 11, 2016

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 03 CR 1915 |
| | ) | |
| ANDRE HOLMES, | ) | Honorable |
| | ) | Michael McHale, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE CONNORS delivered the judgment of the court, with opinion.
Presiding Justice Liu and Justice Harris concurred in the judgment and opinion.

**OPINION**

¶ 1    In 2010, the State filed a petition to determine whether defendant, Andre Holmes, was a sexually dangerous person pursuant to the Sexually Dangerous Persons Act (Act) (725 ILCS 205/1.01 *et seq.* (West 2010)).  Following a 2013 bench trial, defendant was found to be a sexually dangerous person and committed to the custody of the Department of Corrections.  On appeal, defendant asserts that: (1) he was deprived of due process when the State vindictively and belatedly sought his commitment as a sexually dangerous person; (2) the petition should have been dismissed because it was filed outside the applicable statute of limitations; (3) the petition was barred by collateral estoppel; (4) he was denied his constitutional right to a speedy

trial; (5) the court improperly admitted and relied on a diagnosis that should have been subject to

a *Frye* hearing (*Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)); (6) the expert witnesses

improperly testified outside the scope of their written reports; (7) the court improperly admitted

an expert's prior consistent statement; (8) the court improperly restricted cross-examination about

a complaining witness's false allegations of rape; (9) the court failed to make the requisite

finding that defendant had serious difficulty controlling his criminal sexual behavior; and (10)

the evidence did not show beyond a reasonable doubt that defendant had a mental disorder

distinct from a typical recidivist rapist. We affirm.

¶ 2                                    I.  BACKGROUND

¶ 3       This matter concerns two proceedings: a criminal proceeding initiated in 2003 and the

sexually dangerous person proceeding initiated in 2010. Throughout both matters, defendant's

history of committing sexual offenses was at issue, and we briefly summarize that history here,

beginning with the most recent. The State's versions of the incidents were as follows. On

December 28, 2002, defendant struck and choked the victim, J.B., forced her into a car, and

sexually assaulted her at knifepoint. In 1996, defendant was convicted of attempted forcible rape

in Louisiana after he forced himself on the 17-year-old victim who he had been dating, and

sexually assaulted her against her will. In that incident, defendant bent the victim's hands back

to stop her from resisting, covered her mouth, and threatened to kill her if she said anything. In

1994, defendant was convicted of sexual battery in Louisiana. In that incident, defendant told

the victim, who he had been dating, that he was armed with a gun, and then punched her in the

stomach and forced her into a car. Once defendant and the victim arrived at his home, defendant

showed the victim a kitchen knife and vaginally raped her. In 1989, defendant was convicted of

sexual battery in Florida. There, defendant and the victim were married but legally separated at

the time of the offense.  Defendant went to the victim's home and offered to take her to church.  As the victim got ready, defendant grabbed her from behind, choked her until she lost consciousness, removed her clothing, and sexually assaulted her.

¶ 4                                    1.  Criminal Proceedings

¶ 5      Defendant was indicted for the incident with J.B. in January 2003, and was charged with 12 counts of aggravated criminal sexual assault and criminal sexual assault.  On August 19, 2003, the State filed a motion to allow other crimes evidence pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3 (West 2002)).  In this motion, the State asserted that it should be permitted to present evidence at trial of defendant's 1994 and 1996 convictions in Louisiana.  The State conceded that the 1989 sexual battery conviction in Florida was too remote, but contended that the 1994 and 1996 incidents were relevant to show defendant's propensity to try to force girlfriends and acquaintances to have sex with him and to rape and beat them when they refuse.  According to the State, all three crimes happened during an approximately six-year period, excluding time defendant spent in custody, and there were factual similarities among the three crimes.  The State further asserted that the other crimes evidence would rebut the defense of consent and ensure that a jury would not be misled to believe that the latest assault was an isolated incident.  The State also contended that apart from showing defendant's propensity, the evidence was relevant to show identity, intent, motive, and *modus operandi*.  According to the State, violent rapes committed by otherwise "normal" men are crimes that are inherently difficult for juries to understand.  The State asserted that defendant was, "to say the least, a man who reacts violently to rejection and rapes women who will not agree to submit to his demands for sexual relations."  In response, defendant asserted in part that

the other crimes evidence would unfairly prejudice his case and that any probative value of the other crimes would be significantly outweighed by their prejudicial effect.

¶ 6     On June 10, 2004, at the hearing on the State's motion, defendant asserted that if evidence of the other crimes was permitted, "we're going to be having three different trials going on at once." Defendant further contended that the potential prejudice was "just inexplicable" and he would not receive a fair trial if the other two convictions were permitted. Defendant also noted that the current victim, J.B., had "prior false allegations" of rape against a football player, from whom she currently collected child support. The State responded that it did not yet have discovery from the defense.

¶ 7     Ultimately, the court barred the use of the 1994 and 1996 crimes. The court stated that the 1994 case occurred too long ago and there was no similarity between the 1996 case and the current case.

¶ 8     On September 7, 2004, defendant filed a motion for specific additional discovery, seeking the location and dates of any previous reports of assault, sexual assault, battery, or rape made by J.B. On October 21, 2004, the State disclosed that J.B. stated in an interview that she had been a victim in only one previous incident of assault, sexual assault, battery, or rape. J.B. reported that the incident occurred between 1989 and 1992 in Ohio and involved her boyfriend, who punched her in the face during an argument.

¶ 9     On May 30, 2006, the State filed a motion to reconsider the court's ruling about the other crimes evidence. The State asserted that two years after it filed its original motion, new discovery was tendered by defendant that indicated that J.B. reported a crime of rape in 1995 from which a child was born. The State further stated that J.B. currently collected child support from the man she had accused. According to the State, defendant planned to introduce this

evidence when cross-examining J.B. at trial. The State contended that in light of this new discovery, the State should be allowed to present evidence of the 1994 and 1996 incidents. The State asserted that it would be "outrageously prejudicial" to deny evidence of defendant's prior incidents, but allow the evidence about J.B.

¶ 10    At a subsequent hearing, defense counsel confirmed that he intended to cross-examine J.B. about the 1995 rape allegation because she had previously denied any other reports except for the domestic battery claim against her boyfriend in 1989. The State contended that it would be unfair if the trier of fact believed that J.B. may have possibly consented to have intercourse with defendant, but did not know that three other women had not consented.

¶ 11    Ultimately, the court denied the State's motion to reconsider, stating that "when the layperson hears propensity, it begins to snowball *** to almost proof of the crime," which the court believed to be against the presumption of innocence. The State then requested that the other crimes evidence be allowed to show defendant's motive or intent, or to show lack of consent. The State asserted that if it could not present evidence of the other crimes, but J.B.'s 1995 allegation was permitted, the State "would be substantially impaired in proving our case beyond a reasonable doubt," and defendant "probably will be acquitted by the trier of fact because we will not be able to prove our case beyond a reasonable doubt." Nonetheless, the court denied the motion to reconsider.

¶ 12    On June 2, 2006, the State filed a certificate of substantial impairment and appealed the court's ruling pursuant to Illinois Supreme Court Rule 604(a)(1) (eff. Dec. 13, 2005). The appellate court issued its decision on June 18, 2008. *People v. Holmes*, 383 Ill. App. 3d 506 (2008). The court stated that although the State normally has 30 days to appeal or seek reconsideration of a trial court's order, if the facts changed materially from the time the order was

entered, and " 'the new evidence [is not] of a nature that with due diligence could have been presented' at the time of filing the earlier motion, then the court may correct its ruling in light of those newly presented facts." *Id.* at 513 (quoting *People v. Williams*, 138 Ill. 2d 377, 394 (1990)). The State had argued that the "new discovery" that J.B. had falsely accused a man of rape before agreeing to accept child support payments for the child who was subsequently born was a new and material change that permitted the trial court to reconsider its initial ruling. *Id.* The court disagreed, stating that the fact that defendant physically produced a police report two years after defendant disclosed its contents did not make the information or allegations contained in it "new." *Id.* However, the court found that the victim's failure to disclose a prior report of sexual assault, even after defendant filed supplemental discovery to uncover it, was a new development that triggered review of the 2004 order. *Id.* at 514. Ultimately, the court found that the 1994 conviction was admissible, but the 1996 conviction was not. *Id.* at 516. A dissenting justice disagreed that the "new fact" was actually new or that due diligence would not have disclosed the discovery material with J.B.'s 1995 accusation. *Id.* at 520 (Cunningham, J., dissenting).

¶ 13    On July 23, 2008, defendant filed a petition for leave to appeal to the Illinois Supreme Court. On October 8, 2009, the supreme court dismissed the appeal for lack of jurisdiction. *People v. Holmes*, 235 Ill. 2d 59 (2009). The court stated that review of a trial court's order outside the 30-day window would be allowed with a showing of a material change in the facts that, with due diligence, could not have been presented during the previous proceedings. *Id.* at 67. The court found that there was no material change in the facts and the State failed to demonstrate due diligence where it was made aware of J.B.'s 1995 allegation at the outset of the proceedings. *Id.* at 68. The supreme court's mandate issued on November 12, 2009.

¶ 14                              2. Sexually Dangerous Person Proceedings

¶ 15    Subsequently, on March 16, 2010, the State filed a petition to proceed under the Act and requested that the court appoint two qualified psychiatrists to determine whether defendant was a sexually dangerous person. In addition to the 2002 offense involving J.B., the petition also summarized the sexual offenses that had occurred in 1989, 1994, and 1996. Defendant filed a motion to dismiss the petition, but this motion is not in the record.

¶ 16    At a subsequent court date, the State asserted that if defendant was not found to be sexually dangerous, the State would proceed with the criminal case. The State further contended that proceeding with the petition was an alternative to seeking punishment, and that the State was "seeking to rehabilitate in a different arena." In response, defense counsel asserted that if the State was truly concerned about defendant's mental state, it would have filed the petition seven years earlier. According to defense counsel, the State filed the petition in response to "a bunch of unfavorable rulings."

¶ 17    At a hearing on defendant's motion to dismiss, defendant asserted several grounds for dismissal. Defendant contended that the petition was barred by the five-year statute of limitations in the Code of Civil Procedure (735 ILCS 5/13-205 (West 2002))—which defendant asserted was the longest statute of limitations that would apply—and that all the facts that were needed to file a petition were known to the State in August 2003. Defendant also contended that he was deprived of his constitutional right to a speedy trial. Additionally, defendant asserted that the State would be unable to prove-up the petition because the State could not relitigate the prior rulings that the 1994 and 1996 convictions could not be used to show propensity.

¶ 18    In response, the State asserted that no statute of limitations applied to the petition. The State further contended that defendant had never demanded a speedy trial. Additionally, the

State noted that a petition is focused on determining whether a person suffers from a mental disorder and is at a substantial risk to reoffend, and does not involve proving the conduct described in the petition.

¶ 19     In a written memorandum opinion and order and oral ruling, the court denied defendant's motion to dismiss on February 22, 2011.  The court found that according to the Act's language, the State could file a petition at any time while a criminal charge is pending and no other statute of limitations applied.  The court also found that defendant was not denied his right to a speedy trial.  As to defendant's argument that the petition was an attempt to relitigate issues already decided, the court stated that the petition was "a completely separate civil proceeding," and while the parties were the same in the criminal proceeding and the proceeding under the Act, "the elements and the purposes are completely different."

¶ 20     The court subsequently appointed two psychiatrists to examine defendant and produce written reports.  In her report, Dr. Angeline Stanislaus diagnosed defendant with sexual sadism and antisocial personality disorder.  According to Dr. Stanislaus, defendant had shown evidence of sexual sadism since 1989, when he choked and raped his then-wife.  Dr. Stanislaus asserted that defendant's sexual sadism affected his volitional and/or emotional capacity, predisposed him to engage in acts of sexual violence, and was coupled with criminal propensities.  Dr. Stanislaus further stated that defendant demonstrated criminal propensities to commit sexual offenses by repeatedly engaging in sexual violence with women.  Based on the assessments she used, Dr. Stanislaus found that defendant was in the "Moderate High Risk" category for reoffending.  In Dr. Stanislaus's report, defendant estimated that he may have had about 150 female sexual partners.

¶ 21    The report from the second psychiatrist, Dr. Terry Killian, stated that he did not find evidence that defendant had a paraphilia or a sexual disorder. According to Dr. Killian, sex offenses constituted "a very small part of [defendant's] sexual activity" and were not the predominant form of his criminal offenses. Dr. Killian stated that aggressive impulses and/or a complete disregard for others appeared to explain defendant's sex offenses. Dr. Killian additionally found that defendant very likely met the criteria for antisocial personality disorder because defendant "certainly [showed] a pervasive pattern of disregard for and violation of the rights of others." According to Dr. Killian, defendant was deceitful, aggressive, showed a lack of remorse, and repeatedly performed acts that were grounds for arrest. The report indicated that in addition to the sexual offenses listed in the petition, defendant's criminal history included numerous arrests for nonsexual offenses, including burglary, retail theft, felony theft, and domestic assault. Dr. Killian acknowledged that he did not have evidence for one of the criteria for antisocial personality disorder—evidence of a conduct disorder before the age of 15—but believed that given the extent of defendant's adult behavior, "he likely exhibited that behavior as well." Dr. Killian stated that he could not be certain that defendant had antisocial personality disorder, but the evidence strongly suggested that he did. Additionally, Dr. Killian opined that based on the assessments he used, defendant had a low-moderate risk of reoffending. Dr. Killian further asserted that while defendant may commit future sex offenses if not confined, he could not say with confidence that defendant had a substantial probability of doing so.

¶ 22    At the trial held on June 13, 2013, Dr. Stanislaus testified for the State. After providing her professional background, she stated that defendant suffered from sexual sadism and personality disorder not otherwise specified with antisocial personality traits (personality disorder NOS). Dr. Stanislaus opined that defendant had both disorders for more than a year

before the petition was filed. According to Dr. Stanislaus, sexual sadism was characterized by the presence of recurrent, intense sexual fantasies, urges, or behaviors in which the physical or psychological suffering of the victim is sexually exciting to the person, and the person acted out the sexual acts with a nonconsenting person.

¶ 23    Dr. Stanislaus testified about how the four incidents in the petition indicated that defendant met the criteria for sexual sadism. In the 1989 incident, Dr. Stanislaus noted that defendant induced physical suffering on the victim by choking and knocking her to the point of unconsciousness, and then engaging in intercourse, showing that defendant caused physical suffering and then was sexually aroused. According to Dr. Stanislaus, physical suffering generally inhibits sexual arousal, but here, defendant was able to be sexually aroused while the victim was suffering. In the 1994 incident, Dr. Stanislaus noted that the victim had been in pain and had facial bruises, which indicated that a sexual assault had occurred in the midst of physical suffering inflicted by defendant. In the 1996 incident, Dr. Stanislaus recalled that defendant pulled the victim's hands behind her back when the victim resisted, as well as put his hand over the victim's mouth to stop her from screaming and threatened to kill her if she said anything. Dr. Stanislaus asserted that here too, defendant caused suffering and pain and still had sexual excitement. As for the 2002 incident involving J.B., Dr. Stanislaus stated that defendant had choked, pushed, and threatened to kill her, as well as held her down and raped her numerous times over the course of two to three hours. Additionally, per reports, J.B. had various bruises and lacerations on her body, all of this indicating that defendant inflicted physical suffering on the victim and engaged in sexual intercourse with her.

¶ 24    Dr. Stanislaus additionally testified that the "core feature" of sexual sadism was that arousal was heightened or maintained in the midst of the victim's suffering. According to Dr.

Stanislaus, that defendant was able to maintain sexual arousal while he was choking a victim indicated that the suffering was part of his excitement. Dr. Stanislaus also noted that there were repeated incidents over the years with multiple partners. At the same time, Dr. Stanislaus testified that most people who engage in sexual sadism or any paraphilic behavior can also engage in healthy sexual relationships. Nonetheless, Dr. Stanislaus noted that sexual sadism is a chronic condition that does not remit on its own, and the only way a person learns to manage the diagnosis is to undergo sex offender treatment, which defendant had not done.

¶ 25    Dr. Stanislaus also testified about the difference between the diagnosis of antisocial personality disorder in her written report and the diagnosis she gave at trial of personality disorder NOS. Dr. Stanislaus explained that a personality disorder is a pattern of maladaptive behaviors that have been present in a person across several domains of his life. Dr. Stanislaus stated that although defendant met most of the criteria for antisocial personality disorder, she had to diagnose him with personality disorder NOS instead because she did not have any records to provide evidence of a conduct disorder by the age of 15. According to Dr. Stanislaus, defendant met the criteria for having antisocial personality traits because across several aspects of his life, he easily violated and lacked regard for the rights of others, had difficulty following rules and regulations, had trouble with authority, and engaged in manipulation and deceit. Dr. Stanislaus had reviewed defendant's general criminal history since 1985 and found that defendant had committed offenses while on probation or parole, which showed that defendant had difficulty following rules and regulations even when he was monitored or placed on some form of court supervision.

¶ 26    Dr. Stanislaus further testified that when a person has both sexual sadism and a personality disorder with antisocial traits, "that drives the sexual sadism" and the person "is most

likely to act on sexual urges and fantasies resulting in increase of committing future sex offenses." According to Dr. Stanislaus, defendant was at a "moderate high risk" to reoffend and it was substantially probable that defendant would reoffend. Dr. Stanislaus also stated that defendant's mental disorder was coupled with a propensity to commit sex offenses and that based on his criminal history, he demonstrated a propensity towards acts of sexual assault.

¶ 27    On cross-examination, defense counsel explored Dr. Stanislaus's diagnoses. Defense counsel confirmed with Dr. Stanislaus that in the written report, she diagnosed defendant with antisocial personality disorder, but at trial, she testified that defendant had personality disorder NOS. Dr. Stanislaus admitted that she had not submitted an addendum that indicated the changed diagnosis. When asked when she had first opined the diagnosis of personality disorder NOS, Dr. Stanislaus responded that she had disclosed during a deposition that because she did not have evidence of a conduct disorder by the age of 15, defendant did not meet the full criteria for antisocial personality disorder. As a result, she "changed and explained" the diagnosis to personality disorder NOS. Dr. Stanislaus admitted that she had made a mistake in the report, and in response to defense counsel's question about when she became aware of the mistake, Dr. Stanislaus stated that it had been during the deposition, whereupon she changed the diagnosis and explained the reason for the change. Dr. Stanislaus further stated that the deposition occurred on September 28, 2012, and that state's attorneys and defense counsel had been present. According to Dr. Stanislaus, the only difference between the two diagnoses is that personality disorder NOS "meets all the criteria of antisocial personality disorder except for that I do not have enough information to clearly conclude that he had [a] conduct disorder by the age of 15."

¶ 28    Defense counsel also raised the issue of J.B.'s prior outcry. Specifically, defense counsel asked Dr. Stanislaus whether it would "bear on your overall opinion with regard to the [J.B.]

incident if you were to be aware that [J.B.] had made a false accusation of rape in the past?" The State objected, stating that defense counsel's question called for a legal conclusion and there had been "no showing that there was, in fact, what the [d]efense is referring to as a false allegation of rape." The court asked defense counsel for an offer of proof. Defense counsel responded that J.B. had alleged that she was raped by a football player and that she conceived a child as a result, but she never followed through and subsequently sued the football player for child support. According to defense counsel, the football player would state that he never knew that J.B. had made a rape allegation and that the allegation was false and a detective would state that J.B. never followed through. The State asserted that "the issue here is whether or not they can prove that it's, in fact, a false allegation," and that J.B.'s failure to cooperate did not indicate "that it was [*per se*] a \*\*\* false allegation of sexual assault." The State maintained that "it should not be referred to as a false allegation of rape." The court agreed with the State and stated the objection was "sustained as to false allegation. You don't know if it's false." The court directed defense counsel not to "refer to it as a false allegation."

¶ 29    After the State rested, defendant moved for summary judgment, contending that the State did not prove that defendant had a mental disorder. Defendant asserted that the diagnosis of sexual sadism was flawed because the presence of physical suffering did not mean that defendant was aroused by the suffering. Defendant further contended that the diagnosis of personality disorder NOS was problematic. Defendant noted that the diagnosis in Dr. Stanislaus's report was wrong and Dr. Stanislaus did not file an addendum. Defendant asserted that Dr. Stanislaus's diagnosis was not reliable and her methodology was incorrect. Defendant noted that it was only when Dr. Stanislaus became aware that she needed more information for a diagnosis of antisocial

personality disorder that she "[changed] her direction and at the deposition now we have a completely different disorder."

¶ 30    The court denied defendant's motion, finding that the sexual sadism diagnosis was not "utterly implausible."  The court further stated that according to Dr. Stanislaus's testimony, antisocial personality disorder and personality disorder NOS had the same criteria, except that the former required evidence of a conduct disorder before the age of 15.  The court did not see a significant difference between the two disorders and stated that Dr. Stanislaus did not have to submit an addendum.

¶ 31    Dr. Killian testified for the defense.  After providing his professional background, Dr. Killian stated that outside of the four sexual offenses at issue, there was not much evidence that defendant had a sexual disorder.  Dr. Killian further stated that there was also not much evidence that defendant derived pleasure from hurting women and there was no evidence that defendant was specifically aroused by inflicting pain.  Dr. Killian concluded that defendant very likely had antisocial personality disorder, but he could not make that diagnosis with certainty because he did not have defendant's adolescent criminal history.  Dr. Killian stated that "everything else in his life, everything else that I know about [defendant] points to antisocial personality disorder." Dr. Killian asserted that it would be incorrect to say that he could not make a diagnosis because "psychiatric diagnosis isn't strictly we look at a certain number of pieces of information and you add those things up."  Dr. Killian further stated that the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision, DSM-IV-TR, at xxxii (2000) cautions that it is "not meant to be used in a cookbook fashion." Additionally, Dr. Killian testified that defendant was at a high risk for reoffending if not kept in a locked facility, and that he had a propensity to commit acts of sexual assault.  Dr. Killian noted

that he had made an error in his written report about defendant's risk of reoffending and had sent an addendum accordingly.

¶ 32    During the State's cross-examination, Dr. Killian stated that "within a reasonable degree of confidence, psychiatric confidence[,] I can say that he has antisocial personality.  What I said a few minutes ago is I can't say so with absolute certainty because I don't have the adolescent criminal history.  Given his adult behavior and what I saw, it would be very surprising if he had not had conduct disorder as a young man."  Dr. Killian further stated that antisocial personality disorder was not specifically coupled with a propensity towards sex offenses, but defendant "has what I believe with a reasonable degree of confidence is antisocial personality disorder and *** he does have such a criminal propensity."  Dr. Killian could not say that the propensity was directly linked to the antisocial personality disorder because the disorder was not specifically a sexual disorder, but defendant's antisocial behavior included the criminal acts he committed.

¶ 33    In its closing argument, the State noted that Dr. Stanislaus diagnosed defendant with sexual sadism and personality disorder NOS.  The State further asserted that Dr. Killian also diagnosed defendant with a personality disorder and stated that Dr. Killian "tried to initially say it was probable antisocial disorder," but "essentially *** admitted on cross-examination that [defendant] has a personality disorder."

¶ 34    Defense counsel argued in closing that only one issue was at stake—whether the State proved beyond a reasonable doubt that defendant had a mental disorder.  Defense counsel stated that Dr. Stanislaus had the opportunity to make additions and corrections to her report and did not correct the diagnosis or submit an addendum about her error and the changed diagnosis.  Additionally, defense counsel stated that Dr. Killian knew he could not make an affirmative diagnosis of antisocial personality order, but that "I guess you could say the State flipped him"

on cross-examination, when Dr. Killian testified that he believed within a reasonable degree of certainty that defendant had antisocial personality disorder. According to defense counsel, the doctors' diagnoses changed because the doctors realized they made a mistake. Defense counsel posited that when Dr. Killian "basically changed his testimony, changed his opinion about the diagnosis," he was either "wishy-washy" or impeached himself. Defense counsel further stated that Dr. Stanislaus clearly admitted she had made a mistake. Defense counsel contended that the State provided a "shifting round of testimony, of changing diagnosis, of changing opinions" and that "they expect you to believe this morass of testimony." Defense counsel further asserted that each diagnosis was fraught with contradictions, disagreements, or changes in opinion, which was not a basis for finding proof beyond a reasonable doubt.

¶ 35    The court found that defendant was a sexually dangerous person. According to the court, the State proved that defendant suffered from sexual sadism. The court recognized that the experts had different opinions about whether defendant was aroused by his victims' pain and suffering, but found that Dr. Stanislaus was far more experienced in working with sexual offenders than Dr. Killian. The court stated that defendant was aroused by pain and suffering and that the infliction of pain was "so closely connected with the forced sexual intercourse that he was aroused." The court further stated that the force and violence used went beyond what was necessary to gain the victims' compliance. Additionally, the court found that defendant suffered from antisocial personality disorder and personality disorder NOS. The court stated that the two diagnoses were basically the same but for the lack of juvenile records to show if defendant had a conduct disorder before the age of 15, and that both experts essentially agreed that defendant suffered from antisocial personality disorder or personality disorder NOS. The court also recalled Dr. Killian's testimony that he could not give his diagnosis with absolute

certainty, but stated that "[a]bsolute certainty is not what's required here. What's required here is proof beyond a reasonable doubt. I feel that his testimony reaches that level."

¶ 36    The court also found that the State proved that defendant's mental disorder was coupled with criminal propensities to the commission of sex offenses. The court defined "criminal propensities" as "a substantial probability that the respondent will engage in the commission of sex offenses if not confined." The court continued that the "clearly defined pattern of sexual offense behavior" made it abundantly clear that defendant had such criminal propensities. The court further stated that defendant had a demonstrated propensity towards acts of sexual assault.

¶ 37    Defendant filed a motion for a new trial that alleged the following: (1) the State failed to prove defendant was a sexually dangerous person "beyond all reasonable doubt"; (2) the court erred in denying defendant's motion for summary judgment at the close of the State's case; (3) the State failed to prove every material allegation of the petition beyond a reasonable doubt; and (4) the court erred in denying defendant's motion to dismiss the petition.

¶ 38    At the hearing on defendant's motion for a new trial, defense counsel asserted that defendant should not have been prosecuted, "even though that's not the correct legal term in this case, but that's what happened after he had a very long delay in the underlying charge." Defense counsel further contended that because there was a dispute between the experts at trial, the court erred when it decided defendant was a sexually dangerous person. In response, the State contended that the court was able to weigh the testimony and the case was proven beyond a reasonable doubt.

¶ 39    Following argument, the court stated as follows:

"Before I rule on the motion for a new trial, I want to clarify my finding. I want to specifically state that I believe—I can't remember the wording that I used,

but I want to specifically state that there was a finding of sexual dangerousness premised on the elements of the statutory sections of the *** Act. And there was or there is an explicit finding that it is substantially probable the person subject to the commitment proceedings, that being [defendant], will engage in the commission *** of sex offenses in the future if not confined. I make that ruling with *People v. James Masterson* in mind. ***

I essentially believe I made that ruling, but I wanted to use that wording just because that case seems to indicate that the wording is extremely important. I don't think it's any different than the ruling I made. It just further clarifies it."

¶ 40 The court then denied defendant's motion for a new trial, stating that the experts were consistent on the substantive underlying issues.

¶ 41                                              II. ANALYSIS

¶ 42 On appeal, defendant asserts the following: (1) he was deprived of due process when the State vindictively and belatedly sought his commitment as a sexually dangerous person in retaliation for the State losing its interlocutory appeal in the Illinois Supreme Court; (2) the petition should have been dismissed for not complying with the applicable statute of limitations; (3) collateral estoppel barred the petition where the petition attempted to relitigate a prior ruling that previous incidents did not show a propensity to commit sexual offenses; (4) he was denied his constitutional right to a speedy trial; (5) the trial court improperly admitted and relied on Dr. Killian's diagnosis of antisocial personality disorder where the diagnosis did not meet the criteria of the DSM-IV and should have been tested by a *Frye* hearing; (6) the experts' testimony was outside of the scope of their written reports; (7) the trial court improperly allowed Dr. Stanislaus's testimony to be bolstered with a prior consistent statement; (8) the trial court

improperly restricted defendant's cross-examination of Dr. Stanislaus about prior false allegations of rape; (9) the trial court did not make the requisite finding that the defendant had serious difficulty controlling his criminal sexual behavior; and (10) the evidence did not show beyond a reasonable doubt that defendant had a mental disorder distinct from a typical recidivist rapist.  We discuss each in turn.

¶ 43                                    1. Vindictive Prosecution

¶ 44    Defendant first contends that he was deprived of due process because the State vindictively sought his commitment as a sexually dangerous person in retaliation for losing its interlocutory appeal in the supreme court.  Defendant argues that the substance and timing of the petition suggest it was filed in retaliation for his successful appeal to the supreme court. Defendant states that without an explanation for a seven-year delay, and with no new facts having come to light about his mental disorder or propensity to commit sexual assault, the State filed the petition shortly after the supreme court mandate was issued, asserting the same incidents for propensity that had been barred from the criminal case.  Defendant further contends that when defense counsel objected to the filing of the petition, the State did not provide any objective facts to justify a change to a qualitatively different and potentially more severe penalty. According to defendant, the criticism of the state's actions in the appellate opinions provided an incentive for the State to act vindictively.

¶ 45    As a preliminary matter, we note that defendant failed to raise this issue below, which ordinarily results in forfeiture.  The two most important tasks of a reviewing court are to ascertain its jurisdiction and determine which issues, if any, have been forfeited.  *People v. Smith*, 228 Ill. 2d 95, 106 (2008).  In criminal cases, a defendant preserves an issue for review by raising it in either a motion *in limine* or a contemporaneous trial objection, and including it in a

posttrial motion. *People v. Denson*, 2014 IL 116231, ¶ 11. In civil cases, a posttrial motion is not required (*Kic v. Bianucci*, 2011 IL App (1st) 100622, ¶ 12), but the defendant must make a contemporaneous objection at trial (*Illinois State Toll Highway Authority v. Heritage Standard Bank & Trust Co.*, 163 Ill. 2d 498, 502 (1994)). Here, defendant failed to raise a vindictive prosecution issue at all in the trial court. While defendant attacked the State's petition on several grounds, he did not specifically contend that the commitment proceedings were a vindictive prosecution. Additionally, defendant's written motion to dismiss is not in the record, and so while we do not know for certain whether the motion asserted that the petition was a vindictive prosecution, we presume it did not. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984) (any doubts that may arise from the incompleteness of the record are resolved against the appellant). Ordinarily, defendant would have been subject to the rule that "[f]ailure to raise an error to the trial court with sufficient clarity and specificity results in forfeiture." *People v. Hayes*, 319 Ill. App. 3d 810, 819 (2001). However, because forfeiture is "in the nature of an affirmative defense that the State may either raise, waive, or forfeit" (internal quotation marks omitted) (*People v. Beachem*, 229 Ill. 2d 237, 241 n.2 (2008)), and the State has not raised forfeiture, we will address the merits of defendant's argument.

¶ 46    We find that the sexually dangerous person proceeding was not a vindictive prosecution. A prosecution is vindictive and violates due process if it is undertaken to punish someone because he did something the law plainly allows him to do. *People v. Hall*, 311 Ill. App. 3d 905, 911 (2000). Vindictiveness is presumed when a prosecutor brings additional and more serious charges after a defendant has successfully overturned a conviction, "effectively subjecting the defendant to greater sanctions for pursuing a statutory or constitutional right." *People v. Rendak*, 2011 IL App (1st) 082093, ¶ 16. In the pretrial setting, where a prosecutor has broad discretion

in charging a defendant, there is no automatic presumption of vindictiveness. *Id*. When no automatic presumption applies, a defendant must establish actual vindictiveness by producing objective evidence that the prosecutor had some animus or retaliatory motive and that tends to show the prosecution would not have occurred without that motive. *Hall*, 311 Ill. App. 3d at 911-12. After the defendant establishes actual vindictiveness, the prosecution must present objective evidence of a legitimate motivation for filing the charge. *Id*. at 912.

¶ 47    Here, defendant's criminal case remained in the pretrial stage, but defendant contends that we should apply a presumption of vindictiveness because a presumption can apply in the pretrial setting under unique circumstances (*Rendak*, 2011 IL App (1st) 082093, ¶ 17), when there is a reasonable likelihood of vindictiveness (*United States v. Goodwin*, 457 U.S. 368, 373 (1982)). Defendant asserts that such unique circumstances existed here, noting that the State brought an entirely new petition after losing its appeal, civil commitment is more severe and qualitatively different than a prison term, and the State did not provide an explanation for waiting seven years to file the petition. Defendant asserts that these circumstances undercut the State's assertion that it sought to provide treatment.

¶ 48    We find that rather than showing a reasonable likelihood of vindictiveness, the State's actions were entirely consistent with the nature of pretrial decision-making. In the course of preparing a case for trial, a prosecutor may realize that his information has a broader significance and his assessment of the proper extent of prosecution may not have crystallized. *Id*. at 381. Additionally, before trial, a defendant is expected to invoke procedural rights that "inevitably impose some 'burden' on the prosecutor," and it is unrealistic to assume that a prosecutor's probable response to such actions is to seek to penalize and deter. *Id*. Invoking these procedural rights "is an integral part of the adversary process in which our criminal justice system operates."

-21-

*Id.* Here, defendant sought to keep out evidence of his other crimes from his criminal trial, and successfully upheld that ruling through the interlocutory appeal. Before the appeal, the State asserted during a hearing that if it was not allowed to bring in evidence of defendant's other crimes but J.B.'s prior outcry was allowed, defendant would probably be acquitted because the State would not be able to prove its case beyond a reasonable doubt. Later, after the supreme court ruling that, in effect, barred the evidence of defendant's other crimes, the State changed course. The prosecutor stated that the petition was an alternative to seeking punishment and that the State was "seeking to rehabilitate in a different arena." These comments suggest that after the supreme court ruling, the State reevaluated its case, just as prosecutors are expected to do before trial. Further, the reasons the State gave for filing the petition are consistent with the purposes of the Act, which are to (1) protect the public by sequestering a sexually dangerous person until that person is recovered and released, and (2) subject a sexually dangerous person to treatment so that the person may recover from the propensity to commit sexual offenses and be rehabilitated. *People v. Trainor*, 196 Ill. 2d 318, 323-24 (2001). It is also worth noting that even in the criminal proceeding, the State sought a life sentence. The circumstances here do not indicate a reasonable likelihood of vindictiveness, but rather reflect a change in approach for addressing defendant's conduct based on new circumstances.

¶ 49     Because we decline to automatically presume vindictiveness, defendant must provide objective evidence of an animus or retaliatory motive and evidence that the prosecution would not have occurred without that motive. *Hall*, 311 Ill. App. 3d at 912. Defendant has failed to do so. Defendant's assertions—that the only change in circumstances was the State losing its appeal, that the petition asserted the same incidents for propensity that had been barred from the criminal case, and that the appellate rulings' criticism of the State provided an incentive to act

vindictively—amount to speculation that the State filed the petition to retaliate against him. Under these circumstances, we reject defendant's vindictive prosecution claim.

¶ 50                                        2. Statute of Limitations

¶ 51    Next, defendant contends that the petition should have been dismissed for not complying with a statute of limitations. Defendant argues that because the Act states that the "provisions of the Civil Practice Law *** shall apply to all proceedings hereunder except as otherwise provided in this Act" (725 ILCS 205/3.01 (West 2010)), at most the five-year statute of limitations from the Code of Civil Procedure applied to the petition. Defendant asserts that as a result, the petition was untimely. Defendant additionally argues that removing a limitations period from sexually dangerous person proceedings is contrary to the Act's language and frustrates the Act's purpose of obtaining treatment for sexually dangerous persons.

¶ 52    Defendant's argument involves two sections of the Act. Section 3.01 of the Act states:

> "The proceedings under this Act shall be civil in nature, however, the burden of proof required to commit a defendant to confinement as a sexually dangerous person shall be the standard of proof required in *** criminal proceedings of proof beyond a reasonable doubt. The provisions of the Civil Practice Law, and all existing and future amendments of that Law and modifications thereof and the Supreme Court Rules now or hereafter adopted in relation to that Law shall apply to all proceedings hereunder except as otherwise provided in this Act." *Id*.

Additionally, section 3 of the Act states:

> "When any person is charged with a criminal offense and it shall appear to the Attorney General or to the State's Attorney of the county wherein such person is so charged, that such person is a sexually dangerous person, within the meaning

of this Act, then the Attorney General or State's Attorney of such county may file

with the clerk of the court in the same proceeding wherein such person stands

charged with criminal offense, a petition in writing setting forth facts tending to

show that the person named is a sexually dangerous person." 725 ILCS 205/3

(West 2010).

¶ 53 We must determine what statute of limitations, if any, applies to a petition. As the issue before us is a matter of statutory construction, our review is *de novo*. *In re Detention of Lieberman*, 201 Ill. 2d 300, 307 (2002). When construing the meaning of a statute, our primary objective is to ascertain and give effect to the legislature's intent. *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 503-04 (2000). We determine legislative intent by examining the language of the statute, which is " 'the most reliable indicator of the legislature's objectives in enacting a particular law.' " *Williams v. Staples*, 208 Ill. 2d 480, 487 (2004) (quoting *Michigan Avenue National Bank*, 191 Ill. 2d at 504). Words and phrases must be interpreted in light of other relevant provisions and must not be construed in isolation. *Id*. Further, we may ascertain the legislature's intent from considering the entire Act, its nature, its object, and the consequences that would result from construing it one way or another. *In re Detention of Lieberman*, 201 Ill. 2d at 308.

¶ 54 We find that a petition is not subject to a five-year statute of limitations and the only time restriction is that a criminal charge must be pending. Our conclusion is based on the interplay between section 3.01 and section 3 of the Act. Section 3.01 states that the "provisions of the Civil Practice Law" apply, "except as otherwise provided in this Act." 725 ILCS 205/3.01 (West 2010). We believe the "otherwise provided" situation is found in section 3, which states that a petition may be filed "[w]hen any person is charged with a criminal offense and it shall appear"

to the Attorney General or State's Attorney that the person is sexually dangerous. 725 ILCS 205/3 (West 2010). Reading the two sections together, a petition may be filed when a criminal charge is pending and it appears that a person is sexually dangerous—no other time limit is imposed. To provide a different statute of limitations for a petition would separate the petition from the underlying criminal charge, which is inconsistent with the Act. See *Potts v. People*, 80 Ill. App. 2d 195, 198-99 (1967) (proceedings under the Act must be part of a criminal proceeding). Additionally, our interpretation aligns with the Act's purpose. The Act provides for treatment and recovery in lieu of criminal prosecution, and the goal of the Act is to provide a sexually dangerous person with an opportunity to receive help for his propensity to commit sexual offenses. *People v. Spurlock*, 388 Ill. App. 3d 365, 375 (2009). Another purpose of the Act is to prevent the mentally ill from being held criminally responsible for crimes committed while mentally ill. *People v. Allen*, 107 Ill. 2d 91, 105 (1985). To impose a five-year statute of limitations, as defendant requests, would cut off opportunities for sexually dangerous persons to receive the treatment they need, and instead subject them to criminal prosecutions when they should not be, which is at odds with Act's goals.

¶ 55    We are not persuaded by defendant's reliance on *People v. Capoldi*, 37 Ill. 2d 11 (1967). *Capoldi* held that the civil timeline for appellate review applied to the Act, and did not address the statute of limitations for filing a petition. *Id*. at 16. Further, the civil timeline for appellate review was expressly provided for in the version of the Act in *Capoldi*. See *id*. at 14-15 ("[t]he provisions of the Civil Practice Act including the provisions for appeal *** shall apply to all proceedings hereunder except as otherwise provided in this Act") (emphasis and internal quotation marks omitted). Here, the language of the version of the Act we are construing demonstrates that a civil statute of limitations does not apply.

¶ 56                                3. Collateral Estoppel

¶ 57    Defendant next contends that collateral estoppel barred the petition. Defendant asserts

that there was a final ruling in the criminal proceeding that the 1994 and 1996 incidents did not

show propensity and notes that the State conceded that the 1989 incident was too remote to show

propensity. Defendant argues that as a result, the State could not use those same incidents in the

sexually dangerous person proceeding to relitigate defendant's propensity to commit sexual

assault, and accordingly, the petition was barred.

¶ 58    The doctrine of collateral estoppel precludes relitigating issues that were resolved in a

prior case. *People v. Jackson*, 2015 IL App (1st) 123695, ¶ 27. Collateral estoppel has three

elements: " '(1) the court rendered a final judgment in the prior case; (2) the party against whom

estoppel is asserted was a party or in privity with a party in the prior case; and (3) the issue

decided in the prior case is identical with the one presented in the instant case.' " *Id*. (quoting

*People v. Tenner*, 206 Ill. 2d 381, 396 (2002)).

¶ 59    We find that the petition was not barred by collateral estoppel because the third element

is not met—the issue decided in the criminal proceeding was different from the issue presented

by the petition. During the criminal proceedings, the State sought to allow evidence of

defendant's other crimes pursuant to section 115-7.3 of the Code (725 ILCS 5/115-7.3 (West

2002)), which allows evidence of a defendant's prior sexual offenses to show propensity if

certain requirements are met. *People v. Donoho*, 204 Ill. 2d 159, 176 (2003). Before the other

crimes evidence is admitted, the court must weigh the probative value of the evidence against

undue prejudice to the defendant, considering: "(1) the proximity in time to the charged or

predicate offense; (2) the degree of factual similarity to the charged or predicate offense; or (3)

other relevant facts and circumstances." 725 ILCS 5/115-7.3(c) (West 2002).

¶ 60      Accordingly, when presented with the State's motion during the criminal proceedings, the court engaged in the weighing process described above.  Ultimately, the court found that too much time had passed between the 1994 offense and the charged offense, and that there was no similarity between the 1996 offense and the charged offense.  On appeal, the supreme court decided the jurisdictional question of whether the interlocutory appeal could be reviewed, and left the trial court's ruling in place.  *Holmes*, 235 Ill. 2d at 72.

¶ 61      Later, when the State filed the petition, at issue was whether defendant was a sexually dangerous person.  Section 1.01 of the Act defines sexually dangerous persons as "[a]ll persons suffering from a mental disorder, which mental disorder has existed for a period of not less than one year, immediately prior to the filing of the petition hereinafter provided for, coupled with criminal propensities to the commission of sex offenses, and who have demonstrated propensities toward acts of sexual assault or acts of sexual molestation of children."  725 ILCS 205/1.01 (West 2010).  Accordingly, defendant's propensity to commit sexual offenses was at issue in the sexually dangerous person proceeding.  Additionally, the State could use defendant's prior criminal acts to prove propensity.  See *People v. Bingham*, 2013 IL App (4th) 120414, ¶ 46, *aff'd*, 2014 IL 115964 (a defendant's prior criminal acts may be admitted to prove propensity to commit acts in pursuit of his sexual urges).

¶ 62      Comparing the criminal and sexually dangerous person proceedings, the issues at stake were different, even though the term "propensity" was used in both.  In the criminal proceedings, the court was presented with defendant's prior offenses, but was tasked with deciding not whether defendant had a propensity to commit sexual offenses, but whether the probative value of the prior offenses outweighed undue prejudice to defendant.  The court ultimately found that one incident happened too long ago and the other was too dissimilar to be admitted.  The court

did not decide whether the incidents themselves showed that defendant had a propensity to commit sexual offenses. In contrast, during the sexually dangerous person proceedings, the State had to prove defendant's propensity. Because the issues were different in the two proceedings, the petition was not barred by collateral estoppel.

¶ 63                                    4. Speedy Trial

¶ 64    Defendant next contends that his constitutional right to a speedy trial was violated because the State waited more than seven years to file the petition. According to defendant, the State did not explain why it waited seven years, and moreover, the State was aware of the facts that would give rise to a petition at least seven years before it was filed. Defendant also notes that the supreme court found that the State failed to act diligently in the criminal case and that a dissenting appellate court opinion criticized the State's actions as well.

¶ 65    Initially, the State asserts that defendant forfeited review of this issue because he never demanded trial and failed to preserve the issue in his motion for a new trial. However, defendant raised a speedy trial issue in his motion to dismiss the petition, stated in his motion for a new trial that the court improperly denied his motion to dismiss, and referred to a "very long delay" in his criminal proceeding. Perhaps defendant could have been more specific, as the "[f]ailure to raise an error to the trial court with sufficient clarity and specificity results in forfeiture." *Hayes*, 319 Ill. App. 3d at 819. However, forfeiture is a limitation on the parties and not the reviewing court, and we may overlook forfeiture where necessary to obtain a just result or maintain a sound body of precedent. *Wilson v. Humana Hospital*, 399 Ill. App. 3d 751, 757 (2010). Given the unique situation, we will address this issue on the merits.

¶ 66    Defendant recognizes that the Illinois speedy trial statute (725 ILCS 5/103-5 (West 2010)) does not apply to sexually dangerous persons proceedings. *In re Detention of Hughes*,

346 Ill. App. 3d 637, 648 (2004). However, even though the proceedings are civil in nature, a defendant in a sexually dangerous person proceeding must be accorded the essential protections available at a criminal trial, and has a due process right to a speedy trial. *People v. Trainor*, 196 Ill. 2d 318, 328 (2001). While this right is not the same as the right to a speedy trial under the state or federal constitutions, the analysis accorded to a sixth amendment right to a speedy trial provides meaningful guidance and has been applied to sexually dangerous person proceedings. *In re Detention of Hughes*, 346 Ill. App. 3d at 648-49. Four factors must be balanced to determine whether a defendant was deprived of his speedy trial right: the length of the delay, the reasons for the delay, the defendant's assertion of his right, and the prejudice, if any, to the defendant. *People v. Crane*, 195 Ill. 2d 42, 48 (2001). These factors are closely related and no single factor is necessary or sufficient to find that the right to a speedy trial has been violated. *Id*. at 52. Further, "because the remedy for a speedy trial violation requires that a defendant go free, the right to a speedy trial should always be in balance and consistent with the public's right to justice." *In re Detention of Hughes*, 346 Ill. App. 3d at 649. As for the standard of review, any factual determinations are upheld unless they are against the manifest weight of the evidence, and the ultimate determination of whether a defendant's speedy trial right has been violated is reviewed *de novo*. *Crane*, 195 Ill. 2d at 51-52.

¶ 67    Examining the length of the delay, we note that a certain amount of delay is " 'inevitable and wholly justifiable.' " *Id*. at 52 (quoting *Doggett v. United States*, 505 U.S. 647, 656 (1992)). A speedy trial inquiry will not be triggered unless the complained-of delay crosses the threshold from ordinary to "presumptively prejudicial," which has generally been found to be a delay approaching one year. (Internal quotation marks omitted.) *Id*. at 52-53. Here, defendant was charged criminally in 2003, the sexually dangerous person petition was filed in 2010, and his

sexually dangerous person trial took place in 2013. Accordingly, the delay was presumptively prejudicial. However, a presumptively prejudicial delay does not mean that the delay will be found to have actually prejudiced the defendant. *Id*. at 53. Instead, it marks the point at which we analyze the delay under the remaining three factors listed above. *Id*.

¶ 68    Defendant states that the delay from the indictment to when the petition was filed violated his speedy trial right. We find it helpful to our analysis of the reasons for the delay to divide that seven-year period into four segments: (1) January 23, 2003, to June 10, 2004; (2) June 10, 2004 to May 30, 2006; (3) June 2, 2006, to November 12, 2009; and (4) November 12, 2009, to March 16, 2010. Although the State bears the burden of justifying any delay that has occurred, defendant's conduct throughout the entire seven-year period is relevant. See *id*. at 53, 58 (defendant's conduct in asserting, or failing to assert, rights was a factor to be weighed in the balancing test and failure to assert the right would make it difficult to prove he was denied a speedy trial); *In re Detention of Hughes*, 346 Ill. App. 3d at 650 (while analyzing speedy trial claim related to sexually dangerous person petition, noting the respondent's actions during his criminal proceeding).

¶ 69    The first segment, from November 23, 2003, to June 10, 2004, represents the time from when the indictment was filed to when the court denied the State's motion to allow other crimes evidence. According to the record, all continuances during this period were by agreement. Of note during this segment, the State filed its motion to allow other crimes evidence on August 19, 2003. At the hearing on the State's motion, on June 10, 2004, defense counsel stated that the victim involved in the criminal proceedings, J.B., had made prior false allegations of rape against a football player, from whom she also received child support. We find no unjustified delay during this period.

¶ 70    We next summarize the second segment, from June 10, 2004, until May 30, 2006, which covers the date the court denied the State's motion to allow other crimes evidence to when the State filed its motion to reconsider. In that motion, the State asserted that the court should reconsider its ruling because of new discovery tendered by defendant, which showed that J.B. reported a rape in 1995 and collected child support from the man she accused. The record indicates that the continuances during this time were either by agreement, or in 10 instances, at defendant's request.

¶ 71    After the court denied the motion to reconsider, the State filed a notice of appeal on June 2, 2006, beginning the third segment of time that covers the appeals in the appellate and supreme courts. The appellate court issued its decision on June 18, 2008, the supreme court issued its decision on October 8, 2009, and the mandate issued on November 12, 2009. Defendant contends that the delay caused by the motion to reconsider and subsequent appeal were unjustified because both were too late and so had no chance of success. We disagree. Reasons for a delay are assigned different weights. *Crane*, 195 Ill. 2d at 53. For example, evidence that the State intentionally delayed prosecution to gain a tactical advantage will weigh very heavily against the State, while other more neutral reasons, such as a crowded court docket, faulty police procedure, negligence, or incompetence will be weighed less heavily. *Id*. Generally, an appeal by the State is a valid reason that justifies delay. *Id*. at 56. To assess the purpose and reasonableness of an appeal, we consider several factors, including the strength of the State's position on the appealed issue, the importance of the issue in the case's posture, and in some cases, the seriousness of the crime. *United States v. Loud Hawk*, 474 U.S. 302, 315 (1986). If the appealed issue was clearly tangential or frivolous, the delay from the appeal would weigh heavily against the State. *Id*. at 315-16. Further, the charged offense usually must be sufficiently

serious to justify restraints that may be imposed on the defendant pending the outcome of the appeal. *Id*. at 316.

¶ 72 We cannot identify a reason for the State's two-year delay in bringing its motion to reconsider. As the supreme court noted and the record indicates, during the original hearing in 2004, the State was made aware that J.B. had previously accused another man of raping her, but the State claimed in 2006 that this was a new development. See *Holmes*, 235 Ill. 2d at 68 ("the entire controversy underlying this appeal revolves around J.B.'s prior rape allegation, information unchanged since defense counsel first raised the issue during pretrial proceedings"). The State has not explained the two-year delay either. However, during the time that the State was aware of J.B.'s prior allegation but had not yet filed its motion to reconsider, defendant requested 10 continuances. While the State's delay was problematic, defendant also played a role in delaying the proceedings during this two-year period.

¶ 73 Further, the delay caused by the appellate process itself was justified. The appeal was not tangential or frivolous. Though the State ultimately lost in the supreme court due to consequences from its two-year delay in filing a motion to reconsider, the State's lack of success was not a given. Indeed, the appellate court partly ruled in the State's favor and found that one of defendant's prior convictions could be admitted at defendant's trial. *Holmes*, 383 Ill. App. 3d at 519. Further, the State asserted during pretrial proceedings that admitting the other crimes evidence was very important to its case, and moreover, other crimes evidence is powerful. See *Donoho*, 204 Ill. 2d at 170 ("[s]uch evidence is not considered irrelevant; instead, it is objectionable because such evidence has " 'too much' probative value' " (quoting *People v. Manning*, 182 Ill. 2d 193, 213 (1998))). Additionally, although defendant was incarcerated throughout the entire history of this case, including during the interlocutory appeal, the charged

offenses—12 counts of aggravated criminal sexual assault and criminal sexual assault—were serious.

¶ 74 Returning to our timeline, the fourth segment of time began when the case returned to the circuit court after the supreme court mandate was issued on November 12, 2009, and ended when the State filed the sexually dangerous person petition on March 16, 2010. Continuances between these dates were by agreement. There was no unjustified delay during this time.

¶ 75 Next, we examine whether defendant was prejudiced by the delay. Prejudice is assessed in light of the interests of defendants that the speedy trial right was designed to protect— preventing oppressive pretrial incarceration, minimizing the defendant's anxiety and concern about the pending charge, and limiting the possibility that the defense will be impaired by the delay. *Crane*, 195 Ill. 2d at 59. Defendant's continuous incarceration throughout all of the proceedings is a significant consideration. Detention before a proper adjudication "is exactly the type of prejudice that the speedy-trial clause was intended to protect against." *Id*.

¶ 76 At the same time, and as noted above, the speedy trial factors are interrelated and we will not find a violation based on the presence or absence of any single factor. *Id*. at 60. Defendant either acquiesced or agreed to a significant portion of the delay in the trial court and never contested the length of the proceedings until he filed a motion to dismiss the petition on May 20, 2010. Additionally, although we agree that seven years is a significant period of time to have elapsed between the indictment and the filing of the petition, we also find that it is understandable that the State would reevaluate its options after learning that it could not use defendant's prior offenses as part of the criminal proceedings. See *In re Detention of Hughes*, 346 Ill. App. 3d at 650 (in response to the respondent's assertion that the State did not begin proceedings under the Act until after he successfully suppressed certain statements to the police,

the court called the delay "understandable, as the State's view of its case would certainly have been affected by the suppression of those statements"). The seven-year gap between the indictment and the petition was long, and the State's two-year delay in filing a motion to reconsider was problematic, but the overall length of the proceedings appears to have resulted from the State's reevaluation of its case, rather than from the State's desire to intentionally delay the proceedings. Under these circumstances, defendant was not deprived of his right to a speedy trial.

¶ 77                                                5. *Frye* Hearing

¶ 78     Next, defendant contends that the trial court improperly admitted and relied on testimony that should have been subject to a *Frye* hearing. Defendant asserts that on cross-examination, Dr. Killian changed his diagnosis to antisocial personality disorder even though he admitted that he found no evidence of a childhood conduct disorder—a required factor for making the diagnosis. According to defendant, Dr. Killian's testimony amounted to a change in methodology and was sufficiently novel to trigger further inquiry. Defendant further argues that the State did not meet its burden of demonstrating general acceptance that the requirement of a childhood conduct disorder should be abandoned.

¶ 79     Defendant acknowledges that he did not request a *Frye* hearing and requests that we review his claim for plain error. The plain error rule allows a reviewing court to reach a forfeited error that affects substantial rights in two circumstances: (1) where the evidence is so closely balanced that the verdict may have resulted from the error and not the evidence, and (2) where the error is so serious that the defendant was denied a substantial right, and thus a fair trial. *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005). Before we address either prong, we first determine whether an error occurred at all. *People v. McLaurin*, 235 Ill. 2d 478, 489 (2009).

¶ 80    In Illinois, the admission of expert testimony is governed by the standard expressed in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), which dictates that scientific evidence is admissible at trial only if the methodology or scientific principle the opinion is based on is " 'sufficiently established to have gained general acceptance in the particular field in which it belongs.' " *In re Commitment of Simons*, 213 Ill. 2d 523, 529-30 (2004) (quoting *Frye*, 293 F. at 1014).  The *Frye* test only applies to "new" or "novel" methodologies, defined as being "original or striking" or "does not resembl[e] something formerly known or used."  (Internal quotation marks omitted.)  *Id*. at 530.  Indeed, "[t]he purpose of the *Frye* test is to exclude new or novel scientific evidence that undeservedly creates a perception of certainty when the basis for the evidence or opinion is actually invalid."  (Internal quotation marks omitted.)  *In re Detention of New*, 2014 IL 116306, ¶ 26.  The *Frye* test can apply to a diagnosis.  *Id.* ¶ 32.

¶ 81    Here, we determine that the *Frye* test did not apply to Dr. Killian's testimony because he did not make a new or novel diagnosis.  On direct examination, Dr. Killian testified that defendant very likely had antisocial personality disorder, but he could not make that diagnosis with certainty because he did not have defendant's adolescent criminal history.  On cross-examination, Dr. Killian stated that defendant "has what I believe with a reasonable degree of confidence is antisocial personality disorder," but he could not make that diagnosis with "absolute certainty" because he did not have defendant's adolescent criminal history.  Dr. Killian additionally stated that he would be surprised if defendant had not had a conduct disorder, given his adult behavior and what Dr. Killian observed.  Dr. Killian's testimony on cross-examination was entirely consistent with his testimony on direct examination and with the DSM-IV-TR, "an undisputed authoritative reference manual in the field of psychology and psychiatry."  *Id*. ¶ 42.  As defendant notes, the DSM-IV-TR's definition of antisocial personality disorder requires

evidence of a conduct disorder before the age of 15 (DSM-IV-TR, at 706), which Dr. Killian

admitted he did not have. However, the DSM-IV-TR also states that:

> "[t]he specific diagnostic criteria *** are meant to serve as guidelines to
> be informed by clinical judgment and are not meant to be used in a
> cookbook fashion. For example, the exercise of clinical judgment may
> justify giving a certain diagnosis to an individual even though the clinical
> presentation falls just short of meeting the full criteria for the diagnosis as
> long as the symptoms that are present are persistent and severe." DSM-
> IV-TR, at xxxii.

Dr. Killian used his clinical judgment to state with a reasonable degree of confidence that

defendant had antisocial personality disorder, despite a missing element, just as the DSM guides

clinicians to do. Dr. Killian did not eliminate the requirement for a childhood conduct disorder.

He acknowledged that this piece of evidence was missing, and explained that as a result, he

could not give the diagnosis with absolute certainty. Because Dr. Killian's testimony did not

present a new or novel diagnosis, a *Frye* hearing was not required, and no error occurred.

¶ 82                    6. Testimony Outside the Scope of Written Reports

¶ 83    Next, defendant contends that the trial court improperly admitted the experts' testimony

outside the scope of their written reports. Defendant asserts that on cross-examination, Dr.

Killian diagnosed defendant with antisocial personality disorder even though his written report

had rejected that diagnosis. Additionally, defendant states that during her testimony, Dr.

Stanislaus diagnosed defendant with personality disorder NOS, but her written report did not

include that diagnosis and she did not file an addendum or withdraw her written report.

¶ 84 Defendant appears to argue that this issue has been preserved because defense counsel complained in closing argument that Dr. Killian was "flipped" off his report, cross-examined Dr. Stanislaus about the lack of a written addendum, and argued that the court should consider Dr. Stanislaus's second diagnosis unreliable because it was not in the written report. These actions were not enough to preserve error. In a criminal case, counsel must object to the error at trial and raise the error in a motion for a new trial. *McLaurin*, 235 Ill. 2d at 485. In a civil case, no posttrial motion is required (*Kic*, 2011 IL App (1st) 100622, ¶ 12), but a defendant must make contemporaneous objection at trial (*Denson*, 2014 IL 116231, ¶ 23). Counsel did not specifically object that the experts testified outside the scope of their reports, and failure to raise an error to the trial court with sufficient clarity and specificity results in forfeiture. *Hayes*, 319 Ill. App. 3d at 819. In the alternative, defendant urges that we review this issue for plain error. As stated above, the first step in plain error review is to determine whether an error occurred at all. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

¶ 85 Section 4 of the Act provides that after a sexually dangerous person petition is filed, the court must appoint two qualified psychiatrists, who in turn examine the person and file a corresponding written report. 725 ILCS 205/4 (West 2010). A copy of the report must be given to the defendant. *Id*. To comport with due process, a psychiatrist must not testify outside the scope of his written report. *People v. Austin*, 24 Ill. App. 3d 233, 236 (1974).

¶ 86 As to Dr. Killian, no error occurred because his testimony on direct and cross-examination was consistent with his written report. In his written report, Dr. Killian stated that defendant very likely met the criteria for antisocial personality disorder, but he did not have evidence of a conduct disorder before the age of 15. On direct examination, Dr. Killian testified that defendant very likely had antisocial personality disorder, but he could not make that

diagnosis with certainty because he did not have defendant's adolescent criminal history. On cross-examination, Dr. Killian testified that he could diagnose defendant with antisocial personality disorder with a reasonable degree of confidence, but could not make that diagnosis with absolute certainty because he did not have defendant's adolescent criminal history. In all three circumstances—the report, direct examination, and cross-examination—Dr. Killian essentially stated that defendant probably had antisocial personality disorder, but he could not be certain because of the missing adolescent criminal history. Dr. Killian did not testify outside the scope of his written report.

¶ 87 The question of whether Dr. Stanislaus testified outside the scope of her report is more problematic. In her report, Dr. Stanislaus diagnosed defendant with sexual sadism and antisocial personality disorder. On direct examination, Dr. Stanislaus testified that defendant suffered from sexual sadism and personality disorder NOS. Dr. Stanislaus admitted that she had not submitted an addendum that indicated the changed diagnosis from the written report. She also stated that she had disclosed during a deposition that defendant did not meet the full criteria for antisocial personality disorder and had changed the diagnosis accordingly. While we agree with defendant that Dr. Stanislaus testified outside the scope of her written report in that she gave a different diagnosis at trial, this does not rise to the level of plain error under either prong of the plain error rule. Even apart from the personality disorder NOS diagnosis, there was ample evidence that defendant had a mental disorder, a required finding for civil commitment (725 ILCS 205/1.01 (West 2010)). Dr. Stanislaus also diagnosed defendant with sexual sadism based on defendant's arousal in the midst of his victims' suffering. Although Dr. Killian disagreed that defendant had sexual sadism, he testified that it was very likely that defendant had antisocial personality disorder. Moreover, the trial court did not solely rely on the personality disorder NOS diagnosis

and found that defendant had sexual sadism and antisocial personality disorder. No one testified that defendant did not have a mental disorder, even if the experts disagreed about the specific diagnosis.

¶ 88     Additionally, the admission of Dr. Stanislaus's testimony did not affect a substantial right under the second prong of the plain error rule. The second prong of the plain error rule has been equated with structural error, which is "a systemic error that erodes the integrity of the judicial process" and undermines the fairness of the defendant's trial. (Internal quotation marks omitted.) *People v. Pace*, 2015 IL App (1st) 110415, ¶ 75. Structural error has been recognized in a narrow subset of cases—namely, those involving the denial of a public trial, complete denial of counsel, trial before a biased judge, racial discrimination in grand jury selection, denial of the right of self-representation at trial, and where the trial court gives a defective reasonable doubt instruction. *Id*. None of these situations occurred here. Further, Dr. Stanislaus's testimony did not affect the integrity of the judicial process or undermine the fairness of defendant's trial. Defendant was aware of the changed diagnosis well before trial, as defense counsel had been present at the September 2012 deposition where Dr. Stanislaus disclosed her mistake. Moreover, it was defense counsel who elicited on cross-examination that Dr. Stanislaus changed her diagnosis without submitting an addendum. The purpose of providing a defendant with a copy of the written report before trial is to give him an opportunity to know the psychiatrists' findings, the basis of such findings, and to cross-examine the psychiatrists "in an intelligent fashion and without surprise." *Austin*, 24 Ill. App. 3d at 236. That purpose was fulfilled here, and so we decline to review the admission of Dr. Stanislaus's testimony under the second prong of the plain error rule. Any error is forfeited.

¶ 89                             7. Prior Consistent Statement

¶ 90     Next, defendant contends that the court abused its discretion by admitting and relying on Dr. Stanislaus's prior consistent statement that during a deposition, she diagnosed defendant with personality disorder NOS.  Defendant argues that Dr. Stanislaus's testimony bore directly on the critical question of whether defendant had a mental disorder.

¶ 91     Generally, prior consistent statements are hearsay and inadmissible to bolster a witness's credibility or rehabilitate a witness after he has been impeached by a prior inconsistent statement. *People v. Randolph*, 2014 IL App (1st) 113624, ¶ 14.  Here, Dr. Stanislaus testified on direct examination that defendant had personality disorder NOS, and then testified on cross-examination that she gave this diagnosis at a deposition.  Defendant acknowledges that he failed to properly preserve this error for review because he did not object at trial, and requests that we review for plain error.  However, defendant may not challenge the prior consistent statement at all because he invited the error.  "When a party procures, invites, or acquiesces in the admission of evidence, even though the evidence is improper, that party cannot contest the admission on appeal." *People v. Caffey*, 205 Ill. 2d 52, 114 (2001).  On cross-examination, defense counsel asked Dr. Stanislaus when she first gave the diagnosis of personality disorder NOS.  Dr. Stanislaus responded that the diagnosis was given at the deposition.  The following exchange then occurred between defense counsel and Dr. Stanislaus:

> "Q.  So it's your testimony here today that during your deposition that you testified that he had the anti-personality not otherwise specified diagnosis?
>
> A. No.  Personality disorder not otherwise specified with antisocial personality traits.
>
> Q.  And your testimony here today is that you testified to that language at your deposition?

A.  That is correct."

Because defendant elicited the prior consistent statement, he cannot now complain that it was admitted.

¶ 92    Defendant argues in the alternative that defense counsel was ineffective for eliciting Dr. Stanislaus's prior consistent statement and for failing to object to further testimony and argument about the statements made at her deposition.  Defendant contends that counsel fell below the standard of competence by failing to recognize the application of well-settled evidentiary rules. Defendant additionally asserts that his counsel's actions could not be considered trial strategy because the bulk of the defense consisted of arguing that Dr. Stanislaus was not credible or reliable due to her inconsistent diagnoses.  Defendant further contends the prior consistent statement hurt the defense because the trial court relied on it when denying the motion for summary judgment.

¶ 93    Defendant is entitled to effective assistance of counsel under the same standard as in a criminal case.  *People v. Dinwiddie*, 306 Ill. App. 3d 294, 300 (1999).  To succeed on a claim for ineffective assistance of counsel, a defendant must show that: (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced the defense, in that there is a reasonable probability that but for counsel's errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984).  The failure to satisfy either the deficiency prong or the prejudice prong is fatal to an ineffective assistance claim.  *People v. Enis*, 194 Ill. 2d 361, 377 (2000).

¶ 94    A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, and a defendant must overcome the presumption that, under the circumstances, the challenged action " 'might be considered sound trial strategy.' "

(Internal quotation marks omitted.) *People v. Manning*, 241 Ill. 2d 319, 334 (2011) (quoting *Strickland*, 466 U.S. at 689). Counsel's strategic decisions are "virtually unchallengeable." *Id.* at 333. After consulting with the defendant, counsel has the right to make the ultimate decision about tactics and strategy, including what witnesses to call, whether and how to conduct cross-examination, what jurors to accept and strike, what trial motions should be made, and the defense to be presented at trial. *People v. Ramey*, 152 Ill. 2d 41, 54 (1992).

¶ 95    Eliciting Dr. Stanislaus's prior consistent statement was a strategic decision, used to undermine the evidence that defendant had a mental disorder. During counsel's argument for summary judgment, he stated that Dr. Stanislaus's diagnosis was not reliable and that she "[changed] her direction and at the deposition now we have a completely different disorder." Defendant also contended that Dr. Stanislaus's methodology was incorrect. During closing argument, defense counsel noted that Dr. Stanislaus admitted that she made a mistake and contended that the State had provided a "shifting round of testimony, of changing diagnosis, of changing opinions," and expected the court to believe "this morass of testimony." Defense counsel also asserted that each diagnosis was "fraught with contradictions, disagreements[,] or changes in opinion," which was not a basis for finding proof beyond a reasonable doubt. Based on these comments, defense counsel intentionally elicited Dr. Stanislaus's prior consistent statement in service of the theory that experts' diagnoses were unreliable because they kept changing. As a result, counsel's performance was not deficient and defendant's ineffective assistance claim fails.

¶ 96                              8. Restricting Cross-Examination

¶ 97    Next, defendant contends that he was deprived of due process because the court improperly restricted his cross-examination of Dr. Stanislaus about a witness's false allegation of

rape. Defendant argues he was entitled to contest the facts presented about the underlying criminal charge, and the court's refusal to allow cross-examination resulted in manifest prejudice. Defendant contends that if the cross-examination had been allowed, he could have shown that Dr. Stanislaus did not have an adequate basis for her opinion that defendant raped the witness because of his sexual sadism.

¶ 98   Although proceedings under the Act are considered civil, the right to due process applies and the defendant has the right to confront and cross-examine the witnesses testifying against him. *In re Detention of Hunter*, 2013 IL App (4th) 120299, ¶ 30. At the same time, a trial judge has wide latitude to impose reasonable limits on cross-examination based on concerns of harassment, prejudice, confusion of issues, witness safety, or repetitive interrogation. *People v. Dall*, 207 Ill. App. 3d 508, 524 (1991). On review, the question is whether the limitation created a substantial danger of prejudice by depriving the defendant of the ability to test the truth of the witness's direct testimony. *Id*. Further, "the scope of cross-examination is within the sound discretion of the trial judge and *** a reviewing court will not interfere unless there has been a clear abuse of discretion resulting in manifest prejudice to the defendant." *People v. Leak*, 398 Ill. App. 3d 798, 822 (2010). An abuse of discretion occurs where the court's decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would agree with the position taken by the court. *People v. Becker*, 239 Ill. 2d 215, 234 (2010).

¶ 99   The State asserts that defendant has forfeited this issue under criminal standards because he did not include the matter in his posttrial motion. In response, defendant contends that he followed the proper procedure by presenting an offer of proof and not continuing to question in a way that the court found objectionable. Forfeiture aside, the court's ruling was not an abuse of discretion. The exchange at issue happened during defendant's cross-examination of Dr.

Stanislaus. Defense counsel asked Dr. Stanislaus whether it would "bear on your overall opinion with regard to the [J.B.] incident if you were to be aware that [J.B.] had made a false accusation of rape in the past?" The State objected on the basis that the question called for a legal conclusion and contended that the victim's lack of cooperation did not mean that her prior allegation was false. The court agreed with the State, noting that there were many reasons why someone might initially report a rape and then decide not to cooperate. The court added that "simply the fact that they did not [cooperate] after initially reporting it does not prove that it's false. So you will not refer to it as a false allegation."

¶ 100     Based on what actually transpired, defendant misrepresents the record when he states in his brief that the court "would not allow cross-examination because the motive of the complainant was ambiguous." The court's ruling merely limited how the prior allegation was characterized and avoided any confusion about whether the allegation was actually false—a matter that had not been decided. Defendant could not refer to the allegation as "false," but the court did not prohibit all cross-examination about the substance of defendant's question. Defendant could still ask Dr. Stanislaus about the underlying facts circumstances of the victim's prior rape allegation, and how they would impact her opinion. As a result, defendant was not manifestly prejudiced and the court's ruling was not an abuse of discretion.

¶ 101                                   9. Serious Difficulty Finding

¶ 102     Next, defendant contends that his commitment must be reversed where the court did not make the requisite finding that he had serious difficulty controlling his criminal sexual behavior. Defendant asserts that the trial court did not make any reference to his emotional or volitional capacity. According to defendant, the findings in this case were constitutionally insufficient.

¶ 103   To classify a defendant as a sexually dangerous person under the Act, the State must prove that the defendant has: (1) a mental disorder existing for at least one year before the petition was filed; (2) criminal propensities to the commission of sex offenses; and (3) demonstrated propensities toward acts of sexual assault or acts of sexual molestation of children. 725 ILCS 205/1.01 (West 2010); *People v. Bingham*, 2014 IL 115964, ¶ 27.   On appeal, we must consider all of the evidence introduced at trial in the light most favorable to the State and determine whether any rational trier of fact could have found the essential elements to be proven beyond a reasonable doubt.   *People v. Bailey*, 405 Ill. App. 3d 154, 171 (2010).

¶ 104   Defendant's argument concerns the findings that the court must make at the end of a sexually dangerous person trial.   In *Kansas v. Crane*, the United States Supreme Court found that to commit someone as a sexually dangerous person, there must be proof that the defendant has "serious difficulty in controlling behavior."   *Kansas v. Crane*, 534 U.S. 407, 413 (2002). Subsequently, our supreme court determined that the Act did not specifically address volitional capacity, failed to define the term " 'mental disorder,' " and did not provide "an explicit standard for gauging the probability or likelihood that the subject of the proceeding will commit sexual offenses in the future."   *People v. Masterson*, 207 Ill. 2d 305, 329 (2003).   To address these problems and comply with *Crane*, the court read the definition of a "mental disorder" from the Sexually Violent Persons Commitment Act (725 ILCS 207/1 *et seq.* (West 1998)) into the Act (725 ILCS 205/1.01 *et seq.* (West 1998)).   *Masterson*, 207 Ill. 2d at 329.   Accordingly, the court construed the term "mental disorder" in the Act "to mean a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in the commission of sex offenses and results in serious difficulty controlling sexual behavior."   *Id.* The court also held that a finding of sexual dangerousness under the Act "must hereafter be

accompanied by an explicit finding that it is 'substantially probable' the person subject to the commitment proceeding will engage in the commission of sex offenses in the future if not confined." *Id.* at 330. In 2006, the legislature amended the Act to define "mental disorder" as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." Pub. Ac. 94-705, § 5 (eff. June 1, 2006) (adding 725 ILCS 205/4.03).[1] Although the current definition of "mental disorder" does not include "serious difficulty" language, there must still be a showing that a defendant has serious difficulty controlling his behavior. *Bingham*, 2013 IL App (4th) 120414, ¶ 35.

¶ 105    Overall, to prove that a defendant has a mental disorder, (1) the State must show that the defendant has serious difficulty controlling his sexual behavior, and (2) the fact finder must (a) make a finding of sexual dangerousness based on the elements of section 1.01 of the Act that is (b) accompanied by an explicit finding that it is substantially probable that the defendant will engage in the commission of sex offenses in the future if not confined. *Id*. ¶ 36. Thus, the State must show that a defendant has serious difficulty controlling his behavior, but only the "substantially probable" finding must be made explicit by the court. Defendant is therefore incorrect when he suggests that the court must also make an explicit "serious difficulty" finding.

¶ 106    *People v. Bailey*, 2015 IL App (3d) 140497, relied on by defendant, does not change this result. There, the court stated that *Masterson* "clearly considered volitional impairment and the 'substantially probable' finding to be two separate requirements for civil commitment." *Id*. ¶ 17. However, although these are two separate requirements for commitment under the Act, they do not both need to be explicit findings by a trial court. Indeed, the problem in *Bailey* was that the

---

[1] In 2013, after defendant's trial, the legislature further amended the Act to include a definition of "criminal propensities to the commission of sex offenses," which "means that it is substantially probable that the person subject to the commitment proceeding will engage in the commission of sex offenses in the future if not confined." Pub. Act 98-88, § 5 (eff. July 15, 2013) (adding 725 ILCS 205/4.05).

trial court failed to make an explicit "substantial probability" finding. *Id.* ¶ 15. The court did not state that there must be an explicit finding that a defendant has serious difficulty controlling his sexual behavior. *Id.* ¶¶ 15-17.

¶ 107   Further, the State proved that defendant had serious difficulty controlling his sexual behavior. " '[D]angerousness and lack of control are the touchstones for civil commitment.' " *People v. Bailey*, 405 Ill. App. 3d 154, 170 (2010) (quoting *Masterson*, 207 Ill. 2d at 328). Further, by acting on their propensities, "those suffering from mental disorders demonstrate dangerousness and impaired volitional capacity." *Masterson*, 207 Ill. 2d at 328. Dr. Stanislaus testified that defendant lacked regard for and easily violated others' rights, and that when both of defendant's diagnoses—sexual sadism and personality disorder NOS—are present, a person "is most likely to act on sexual urges and fantasies resulting in increase of committing future sex offenses." Dr. Stanislaus further noted that there were repeated incidents over the years with multiple partners. Dr. Stanislaus additionally stated that defendant had committed offenses while on probation or parole, which showed that he had difficulty following rules and regulations even while he was being monitored or supervised. Although Dr. Killian testified differently from Dr. Stanislaus, he testified that defendant's antisocial behavior included his criminal acts, defendant was at a high risk for reoffending, and defendant had a propensity to commit acts of sexual assault. Further, the trier of fact was in a superior position to hear the expert testimony, weigh the evidence, and decide if defendant's mental condition made it seriously difficult for him to control his behavior. See *Bailey*, 405 Ill. App. 3d at 170. Based on the evidence, the State proved that defendant had serious difficulty controlling his criminal sexual behavior.

¶ 108   Although defendant does not contend that the court failed to make an explicit "substantial probability finding," we note that the court did so. Initially, the court found that the State had

proven that defendant's mental disorder was coupled with criminal propensities to the commission of sex offenses, and defined "criminal propensities" as "a substantial probability that the respondent will engage in the commission of sex offenses if not confined." Later, in denying defendant's motion for a new trial, the court clarified its ruling and stated "there was or there is an explicit finding that it is substantially probable the person subject to the commitment proceedings, that being [defendant], will engage in the commission *** of sex offenses in the future if not confined." The court made the explicit finding required by *Masterson* in its initial ruling and again when denying defendant's motion for a new trial. Additionally, the language in the court's ruling shows that the court made a finding of sexual dangerousness based on the requirements of the Act.

¶ 109                    10. Sufficiency of the Evidence of a Mental Disorder

¶ 110   Lastly, defendant contends that the evidence did not show beyond a reasonable doubt that he had a mental disorder distinct from a typical recidivist rapist. Defendant challenges the diagnoses given by both of the experts. Defendant asserts that, in finding that defendant had antisocial personality disorder, the court held that the State did not need to show that there was evidence of a childhood conduct disorder, in contrast to what the DSM-IV-TR requires. Defendant further argues that Dr. Stanislaus's testimony about defendant's personality disorder was inconsistent, and was neither reliable nor credible. Defendant also notes that Dr. Killian disagreed with her testimony. Additionally, defendant contends there was conflicting evidence that he was a sexual sadist and that the facts of his prior offenses were not atypical of the many sexual assault cases on the court's criminal docket.

¶ 111   Here, the evidence was sufficient to find that defendant had all three mental disorders raised by the experts. Dr. Stanislaus testified that defendant had personality disorder NOS. This

was different than the diagnosis in her written report of antisocial personality disorder, but Dr. Stanislaus stated that the only difference between the two was evidence of a childhood conduct disorder. According to Dr. Stanislaus, defendant lacked regard for others' rights, had trouble with authority, engaged in manipulation and deceit, and had exhibited these traits across several aspects of his life. Dr. Killian testified that, within a reasonable degree of confidence, defendant had antisocial personality disorder, and that his antisocial behavior included his criminal acts. As for the inconsistencies in Dr. Stanislaus's testimony and Dr. Killian's lack of absolute certainty that defendant had antisocial personality disorder, those were matters for the trier of fact to resolve. It is for the trier of fact to weigh the evidence (*id*.) and assess the witnesses' credibility (*People v. Cole*, 299 Ill. App. 3d 229, 234 (1998)).

¶ 112    The evidence was also sufficient to find that defendant had sexual sadism. In her testimony, Dr. Stanislaus recalled defendant's previous incidents of sexual assault, and stated that in each, defendant was sexually aroused despite the victim's suffering. Dr. Stanislaus testified that the "core feature" of sexual sadism was that arousal was heightened or maintained in the midst of the victim's suffering. Further, as noted above, Dr. Stanislaus stated that when sexual sadism and personality disorder are both present, a person is most likely to act on sexual urges and fantasies. Dr. Stanislaus also noted that defendant had repeated incidents over the years with multiple partners and was at a moderate-high risk to reoffend. We reiterate that " '[d]angerousness and lack of control are the touchstones for civil commitment' " (*Bailey*, 405 Ill. App. 3d at 170 (quoting *Masterson*, 207 Ill. 2d at 328)), and Dr. Stanislaus's testimony covered both of those traits, which distinguishes defendant from being a typical recidivist rapist. Dr. Killian's disagreement with her sexual sadism diagnosis does not change our result. A court may choose to believe one psychiatrist over another and find in favor of the State's petition even when

the State's burden is proof beyond a reasonable doubt. *People v. Antoine*, 286 Ill. App. 3d 920, 926 (1997). Accordingly, the court was entitled to credit Dr. Stanislaus's testimony about sexual sadism over that of Dr. Killian. Overall, based on the evidence presented, the evidence was sufficient to find that defendant had a mental disorder under the Act.

¶ 113                                  III. CONCLUSION

¶ 114   For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 115   Affirmed.