NOTICE
Decision filed 09/09/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 190516-U

NO. 5-19-0516

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Perry County. |
| | ) | |
| v. | ) | No. 18-CF-62 |
| | ) | |
| ALLEN J. FISHER, | ) | Honorable |
| | ) | James W. Campanella, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE VAUGHAN delivered the judgment of the court.
Justices Welch and Cates concurred in the judgment.

**ORDER**

¶ 1  *Held*: Defendant's alleged *Apprendi* violation did not amount to plain error and the court did not engage in improper double enhancement when it imposed defendant's sentence. However, we remand for a new hearing on fines and restitution where the court failed to comply with statutes regarding the imposition of fines and restitution.

¶ 2  Defendant was sentenced to an extended term of 30 years' imprisonment for aggravated battery based on torture and 10 years' imprisonment for intimidation. The court also issued an order providing for fines and restitution. Defendant appeals alleging several errors regarding his 30-year sentence as well as the order setting fines and restitution. For the reasons below, we affirm defendant's sentence and remand for a new hearing on fines and restitution.

1

¶ 3                                    I. BACKGROUND

¶ 4        On April 13, 2018, defendant was charged, by information, with aggravated battery (720 ILCS 5/12-3.05(a)(1) (West 2018)) in that defendant knowingly and intentionally caused great bodily harm, permanent disability, or disfigurement to Robert L. Pfister, by gouging or clawing his eyes, resulting in partial or total blindness to one or both of his eyes. The State also filed a notice of eligibility for extended term sentencing pursuant to section 5-5-3.2(b)(2) of the Unified Code of Corrections (730 ILCS 5/5-5-3.2(b)(2) (West 2018)). On August 3, 2018, the information was amended. Count I remained as originally alleged. Count II charged aggravated battery (720 ILCS 5/12-3.05(a)(1) (West 2018)), based on the same actions as count I but included language stating the aggravated battery was intentional and involved the infliction of torture. Count III charged intimidation (*id.* § 12-6(a)(1)) in that defendant with the intent to preclude Robert from driving on School Street, Swanwick, Illinois, in the future, threatened to cause further physical harm to Robert while causing physical harm to Robert.

¶ 5        On August 23, 2018, a second amended information was filed, alleging the same counts as the amended information. On February 8, 2019, a third amended information was filed alleging the same counts as the amended information. The same day, the State filed an amended notice of eligibility for extended term sentence, stating upon conviction of count I, defendant wa eligible and the State intended to seek an extended term of sentence of 5 to 10 years' imprisonment upon a finding that said conviction was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty pursuant to section 5-5-3.2(b)(2) of the Unified Code of Corrections (730 ILCS 5/5-5-3.2(b)(2) (West 2018)).

¶ 6        At trial, the evidence showed that on April 7, 2018, as Robert was driving on Swanwick-Rice Road, Swanwick, Illinois, he saw an old school to his left that he had not seen before. So, he

turned onto Railroad Street to look at the school. After looking at the school, he came to a dead end that had a gravel spot where he turned his vehicle around. Robert drove slowly back down Railroad Street, heading toward Swanwick-Rice Road, to look at the school on his right. According to Robert, as he started to turn left onto Swanwick-Rice Road, he saw in his side and back mirror that a vehicle was following him off Railroad Street. The car followed Robert for some time. At one point, Robert pulled into a driveway and the car also pulled into a driveway across the street. When Robert pulled out, the car followed him again. Eventually, the car sped past Robert and turned around, driving back toward Robert. Robert realized the car was slowing down and the driver was rolling down his window, so Robert stopped and exited his vehicle.

¶ 7    Defendant was driver of that car and warned Robert to stay off his road. Robert had never been on that road or seen defendant before that day. He explained that he was looking at the old school and did not mean any harm. Defendant asked if Robert was going to stay off his street. Before Robert could say anything, defendant exited his vehicle, pushed Robert, pulled Robert's hood over his head, and began hitting him in the head. Robert was unable to fight back, and defendant threw him into a ditch. Defendant then jumped on Robert, put his knee in his back, put his thumbs on the back of Robert's head, and started gouging his eyes out. Robert stated defendant put his fingers into Robert's eyes sockets and twisted his fingers back and started gouging. Robert apologized and explained that he did not mean to drive on defendant's street. Robert then heard and felt a crack and told the man that he broke his eye socket. Defendant pushed in harder and gouged deeper.

¶ 8    After a little bit, Robert saw a red car pass by and heard a car horn. Defendant then let go of Robert, but as Robert was on his hands and knees, defendant kicked Robert in the head, saying "next time you will know to stay off of my street." Robert could not see out of his left eye and

3

could barely see out of his right eye. He could not see his phone well enough to be able to dial. He heard windchimes, turned, and saw a white house. Robert called out for help and did not get a response. Eventually, a preacher drove by, and Robert put up his hands as he passed. The preacher stopped and helped Robert call a friend who called the police.

¶ 9 About four or five days later, Robert's left eye hemorrhaged and had to be removed. He now wears a prosthetic in that eye. He stated that he endured a lot of pain. He had no sight out of his right eye unless it was close to a bright light. Robert was told it was not probable that he would see again. Robert stated he could no longer drive and was unable to see his new grandchild born after the attack. He stated that he previously worked for the Illinois Department of Transportation but could no longer work and had no other job prospects.

¶ 10 The evidence at trial also revealed an unrelated encounter in 2014 between defendant and his neighbor. The neighbor planted red clover on a small piece of land that neither defendant nor his neighbor owned. After the neighbor realized someone mowed down the clover crop, he spoke to defendant about it. The discussion escalated, and eventually, defendant knocked the neighbor on the ground. While on the ground, defendant put his knee in the neighbor's back and tried to gouge his eye out and was clawing at his face. Eventually, defendant stopped after his wife and son yelled at him. Defendant then kicked the neighbor in the ribs a couple of times. The neighbor suffered multiple fractures to his eye socket and a broken bone on the side of his face.

¶ 11 During the jury instruction conference, the State offered an instruction stating that defendant committed the offense of aggravated battery based on great bodily harm accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. The court posed, "That of course goes to the extended term element of that particular Class 3 charge, right?" Defense counsel stated he had no objection, and the court moved on. At the end of the conference, the State

4

said the aggravated battery based on great bodily harm and aggravated battery based on torture contain the exact same elements besides torture. So, during closing arguments, it intended to tell the jury it must first find aggravated battery based on great bodily harm then wanton cruelty then torture. It stated, "Because if they do torture and they don't do wanton cruelty, we're sunk. Or not sunk. We will just do this again sometime." The court allowed the State to explain it that way, saying it "almost encourage[d] it."

¶ 12    During closing arguments, the State said, "If you decide he is guilty of great bodily harm aggravated battery, if you decide it was wantonly cruel, then I ask that you consider that it was also torture ***. You can't get to torture until you do the other first two."

¶ 13    On February 14, 2019, the jury found defendant guilty of all three counts. It also found that that defendant's actions in the alleged aggravated battery for great bodily harm charge was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty.

¶ 14    On March 21, 2019, a hearing was held to raise any sentencing issues the parties needed to research and brief. The court stated,

> "Count 1, like I said, Class 3 Felony, aggravated battery involving great bodily
> harm which the jury found as an element to the crime would normally be 2 to 5, but
> when you start with the concept that that is a charge involving great bodily harm it
> immediately invokes to me the possibility of extended term."

¶ 15    However, the court found it was likely that the Class 3 felony of aggravated battery based on great bodily harm merged with the Class 1 felony based on torture. The court stated that with respect to count II, the sentencing range was 4 to 15 years' imprisonment. The court further believed that because the jury found that defendant caused extreme physical pain motivated by an intent to increase or prolong the pain, suffering, or agony of the victim, it was "perfectly arguable"

5

that the extended term sentencing of 8 to 30 years' imprisonment was applicable. It then indicated it would have to keep an open mind because the double enhancement rule may preclude extended term sentencing.

¶ 16    The court asked the parties to research the issues because it believed it could only sentence defendant to 4 to 15 years' imprisonment. The court concluded,

"[T]he bottom line is if Mr. Fisher is sentenced to what I believe he can only be sentenced to in Count 2, the Class 1 Felony, which is a maximum of 15 years and then turn around and consecutively be sentenced [on the intimidation conviction] to what cannot in my opinion be more than 10 years, he is looking at 25 years at day-for-day because of the way the legislature has this law written, which kind of flies in the face of a lot of crimes that you have to do 85 percent on and that you have to do a lot more time on because to be perfectly honest, this man is going to be blind the rest of his life."

¶ 17    The court gave the parties one month to research the issues. The parties agreed count I merged with count II, and it would be double enhancement to subject defendant to extended term sentencing on count II.

¶ 18    On June 5, 2019, a sentencing hearing was held. The court noted that the presentence investigation (PSI) report filed on April 16, 2019, needed amended. The parties indicated there were two additional prior convictions than those listed on the PSI report. The State also asked the court to take judicial notice of a new aggravated battery offense charged against defendant involving another inmate at Perry County jail in case No. 19-CF-72 and that Judge Gross found probable cause for those charges. The court agreed to take judicial notice of the new charges.

¶ 19     The court then stated that it investigated several issues that it raised at the presentence hearing. It determined that the Class 3 aggravated battery felony would be merged with the Class 1 aggravated battery felony. For the Class 1 aggravated battery felony, defendant would be subjected to a term of 4 to 15 years' imprisonment unless he was subjected to an extended term sentence. To be extended term eligible, the jury had to find that the crime was done in an exceptionally brutal or heinous way which was indicative of wanton cruelty.

¶ 20     The State averred that count I merged into count II but stated, "The max he could get on that was 15 because it had already been enhanced." The court asked enhanced by what. Defendant replied, "an element of the offense," and the State clarified the torture makes the applicable maximum 15 years instead of 7 years. Defense counsel stated that the maximum applicable sentence would be 15 years' imprisonment for the Class 1 aggravated battery felony and 10 years on the intimidation conviction.

¶ 21     The court asked the State whether it conceded that 15 years was the maximum term of imprisonment for the Class 1 aggravated battery felony, and the State answered affirmatively. The court stated that it did not agree that the law allowed for only a 15-year maximum. However, because the State conceded, the issue was moot, and 15 years' imprisonment would be the maximum possible sentence for the Class 1 aggravated battery felony. The court found it would be bound by the parties' agreement to the applicable maximum because they were "in effect *** putting a cap on it." The State said that its recommendation did not bind the court, but it did not believe it was possible.

¶ 22     A brief recess occurred. When the hearing reconvened, the court announced it was going to adjourn the hearing and reset it, so the parties had an opportunity to review the transcripts and research the issues.

¶ 23    On June 26, 2019, the court reconvened the sentencing hearing. Defense counsel stated that he discussed the amended PSI report with defendant, and they had no further revisions. The State concurred. The court stated it thoroughly reviewed the PSI as amended and the financial impact. The court asked whether the State still conceded that the maximum term for the Class 1 aggravated battery felony conviction was 15 years' imprisonment. The State answered affirmatively. It then said,

> "Well, just in terms of that issue of the extended term on the torture, I was mistaken in my belief that the Court had previously ruled on that. It wasn't so much that we were conceding as it was that I believed that specifically and especially at the March hearing that *** you had indicated that that's what you believed. ***
>
> And you had done subsequent research to that. And to be perfectly frank, your Honor, I thought I was bound by that and that's why I was going forward. I understand now your thinking today. I have come up with some arguments along that thinking and we will be proceeding on the theory that the extended term and the torture is applicable. Defense is not going to agree with me but that's the way I am going to go."

¶ 24    Defense counsel confirmed that he did not believe defendant was subject to extended term sentencing for count II. The court stated,

> "We have three concepts here due to legislative language. You have the concept of great bodily harm, you have the concept of severe bodily injury, and you have the concept of heinous behavior resulting in torture. That could not be researched beyond what I could find and that is that severe bodily injury is something more than great bodily harm. That's the best they could do in case law to help me with

8

whether or not they were equivalent. Since they were deemed to be something different, severe being more than great, I am taking the position for purposes of an appeal that heinous behavior indicative of wanton cruelty and torture is different than severe bodily injury. It's an appealable issue. I can be told and have been in the past that I am dead wrong. But at this point that's one of the things that my research has led me to believe would make the aggravated battery subject to beyond a 15-year maximum. By virtue of the extended term, he could be looking at up to 30 as well as the 10 in the intimidation."

It then stated the sentence for the aggravated battery would run consecutively to the sentence for the intimidation.

¶ 25    Thereafter, Sergeant Reagan was called to testify. Defense counsel objected to evidence of previous crimes but waived any objection to Sergeant Reagan's testimony to the extent he authenticated the pictures that he took. The State asked the court to admit a photograph of one of defendant's prior battery victims that showed the victim's injuries. It averred that Sergeant Reagan took the photo to memorialize the injuries that were present on the day the victim was battered by defendant. The court admitted the photograph.

¶ 26    The State then called the victim's sister, Tammy Travis, to testify. She stated that the victim's daughter called her and informed her of this crime. Upon receiving this information, Tammy went to St. Louis University Hospital to see her brother. She said Robert had metal protection over both eyes, so he did not harm his eyes while he slept. He also had a lot of bruising around his face and no scratches on his arms or knuckles. Tammy testified that Robert currently could not see and was missing his left eye. She said that Robert suffered a great deal of pain, removal of his left eye, insertion of a prosthetic left eye, unsuccessful surgery to his right eye, and

9

several more surgeries. The State admitted a list of Robert's medical services to date, including the costs thereof.

¶ 27    The State asked Tammy about the expenses of Robert's medical care. The total of expenses incurred was $233,697.64, and Robert's total out of pocket expenses was $4718.87. However, Tammy stated Robert would have other surgeries and would need to see Bruce Cook Prosthetics twice a year for the rest of his life, but there was no way to know what the future expenses would total.

¶ 28    Tammy stated that she brought photos and videos of Robert from his life before and after the crime. The court admitted the pictures and videos. The photos and videos showed Robert with his children, grandchildren, friends, benefits he attended, and some of his projects that he worked on in his garage. There were also some photos of Robert holding his fifth grandchild, born after the crime. He could not see that child's face. There were also pictures, after the crime, of projects left unfinished and "toys" unused.

¶ 29    The State played a video. Tammy stated Robert took pride in his gift-wrapping skills and his motorcycles. Tammy described Robert's garage, stating he built it from the ground up. It was his man cave and where he did all his projects, whether they were for himself or friends. He stored his welders and other tools there along with several cars and tinkered with restoration.

¶ 30    Tammy stated that Robert worked for the Illinois Department of Transportation, which was his dream job. For his job, he drove a truck and did concrete work. Tammy stated the video showed some of Robert's projects, such as a trailer he built for a friend and an organization caddy he built out of cigar boxes. The video then showed Robert after this incident. Tammy said he spends a great part of his day on the sofa and on the phone talking to anybody that will call. His truck sits idle, his motorcycle is covered, and his Jeep project is left unfinished. When eating, he feels his

10

way around the plate. Tammy further stated that after the last surgery, Robert had to stay face down for two weeks, including when he slept or had a conversation. She averred that Robert spent most evenings sitting on the bed of his truck. After a neighbor found Robert in the middle of his large yard attempting to get to his garage, his friend erected a guide rope so Robert could walk to his garage.

¶ 31 Tammy testified that defendant took everything away from Robert, including his job. Robert had to relearn how to walk due to balance issues and did not sleep well. He could no longer do the things that she and her family took for granted. The most noticeable thing was the big wide smile that people noticed about Robert was now gone.

¶ 32 The State then read three victim impact statements, from Robert's mother, daughter, and sister. Collectively, they spoke to Robert's life after the crime. He used to walk with long strides but now had unsure, short steps that often caused him to stumble. Simple everyday things were now complicated, such as using the men's room in public places and eating. Robert also endured the pain of numerous surgeries with more to come and his sleep was disrupted. Robert worked for the Illinois Department of Transportation, which was not only a job but a joy that he tried 17 years to obtain. He took pride in fixing the roads but now could not do so. Robert was also a welder, carpenter, concrete setter and finisher, auto restorer, repair guy, road maintainer, heavy equipment operator, and undertook many projects for himself and to help family. Instead of working his dream job or on one of his many projects, his calendar was consumed with medical appointments and court hearings. He could no longer play baseball with his grandchildren, show off his crafts to them, or watch them grow up as he did with his own children. Finding new ways to make memories was difficult. His grandkids shied away from him because he could no longer play as they did, and they did not see him as they did before.

11

¶ 33    Not only Robert was affected by the incident. Robert's mother stated that she battled with trying to forgive defendant and felt he could care less that he deeply hurt Robert and others. Tammy stated that she wanted to wish defendant all the terrible things that could happen to him in prison but said that would not bring back Robert's eyesight. Instead, it would make her a step closer to being the kind of hate-filled person that defendant was. Instead, she chose to pray for defendant's safety and his son, who will grow up without a father.

¶ 34    Robert also submitted a victim impact statement. He said it was hard to express who he was compared to who he would be because words did not do it justice. He stated,

> "How can a person express the dreams and hopes I once had to the reality I live with every day and possibly for the rest of my life? How do I make myself and everyone know how senseless and brutal this act truly was? It is hard for me to wrap my mind around the hatred that one man could have towards another to take something so precious from him in such a heinous and tortured way."

¶ 35    Robert said he went from seeing everything to now living in total darkness. He was a man of adventure, admiring the beauty of the world, loving his family, enjoying his hobbies, giving back to his community through fundraising, and taking pride in his military service. He then said, "Who would have thought my aberration for these things would have paved the road to the nightmare I continue to live with?" Robert stated he went over this incident in his head for anything he could have done to warrant the brutality that defendant imposed, but defendant attacked him for no reason. Defendant was someone who thought nothing of anyone or anything.

¶ 36    Over the last year, he had numerous doctor appointments and hospital visits, looking for hope that his vision would return and wondering when his miracle will come. Robert said the hardest part was wondering "will this be the day or is this all there is for me?" He wanted the court

to know that he was hard working, loved his family and neighbors, and would give the shirt off his back if someone needed it. He took pride working for the Illinois Department of Transportation and being a truck driver, welder, and fabricator. His greatest joy was watching his kids grow and now he would miss out on watching his grandchildren grow and must imagine his new grandchildren's faces. He would miss watching their first smile and steps. He longed to look in his girlfriend's eyes to see the love and joy they had for one another. His relationships had changed tremendously. He was the one who could help at a moment's notice; now, he was the one in need of help every day. He wanted to give back the help his mother gave him while growing up and felt he cheated her out of a peaceful life.

¶ 37    Robert's statement said he found it hard to talk about his everyday living and was scared his life would always be this way. Being blind made everyday tasks challenging, such as figuring out what to wear and walking across the room without stumbling. Everyone was now on edge around him and scared they were going to say or do the wrong thing and upset him. He tried to control his frustration because he did not want to push people away. He did not know how to wrap his mind around his dreams being gone and being excited about new ones.

¶ 38    Robert stated he forgave defendant and prayed for defendant as his enemy. He stated defendant had a choice to give grace and peace that day but chose hatred and vengeance in the cruelest of ways as he had so many times before. Robert posed "think about the next unsuspecting person [defendant] comes into contact with." He then stated,

> "Please keep the community safe for as long as possible. I know this man will be
> out again one day but if he can be put away for as long as possible maybe the next
> victim will have a few more years living and loving this colorful world we live in."

13

¶ 39    Defense counsel provided no evidence. Defendant chose not to provide a statement in allocution.

¶ 40    The State argued that defendant never took responsibility for what he did and never showed remorse. It contended that defendant deserved to go to prison for the rest of his life, stating the community should not be subjected to his rage, anger, and lack of remorse again. The State argued that no factor in mitigation applied. Robert suffered physical harm and pain. Defendant contemplated that his conduct would cause serious harm when Robert said "you broke my eye socket" and defendant adjusted his hands to dig at Robert's eyes more, then stepped back and kicked him. There was no provocation or justification for defendant's actions and defendant had a history of violence. The State argued that defendant's criminal conduct resulted from circumstances likely to recur, because the character and attitude of defendant indicated that he would engage in similar actions in the future. The State further contended that while defendant successfully complied with probation and previous sentences, prior incarceration did not rehabilitate him and "[h]e's still the man he was the first time he committed a crime and whatever else has happened that we don't even know about." It stated the only mitigating factor it could not argue against was that imprisonment would entail hardship on defendant's dependents, as defendant had a wife who was a co-owner in his business and a son who would be a junior in high school. The other factors simply did not apply.

¶ 41    In terms of aggravation, the State argued that defendant's conduct undoubtedly caused serious harm. Defendant also had a history of prior criminal activity, which the court had acknowledged and was listed in the PSI. It also argued the necessity to deter others. It explained this factor was twofold. The first was general deterrence. It acknowledged that once defendant was released, he would have a parole officer and an ankle bracelet but contended those things would

14

not stop defendant from committing the same crime again. It argued the general deterrence was that other people would see that when you engage in such brutal, mind-numbingly incomprehensible activity, you would go to prison for a long time. The second consideration was specific deterrence. It stated no one should have to suffer what the victim in this case suffered and the only way to ensure that was to totally incarcerate defendant for a lengthy sentence. It noted defendant was a danger.

¶ 42 The State then discussed whether extended sentencing applied to the aggravated battery conviction based on torture. It stated that when the jury decided torture was proven, the offense went from a Class 3 felony to a Class 1 felony. The State admitted that case law used the word "torture" when describing brutal and heinous behavior, but those cases did not define torture. The State contended that the statutes indicated that torture was something different from brutal and heinous behavior. It argued that the charge of aggravated battery based on torture included a motivation. The statute stated that there had to be the infliction of, or subjection to, extreme physical pain but that the defendant was also "motivated by an intent to increase or prolong the pain, suffering, or agony of the victim." However, the statute did not require prolonged suffering, just that the person was motivated by the prolonged suffering. As such, a finding of exceptionally brutal or heinous behavior differed from torture because it required actual prolonged suffering. In other words, torture required being motivated by prolonged suffering and brutal or heinous behavior required the result of prolonged suffering. The State believed as such, the court could again enhance the sentencing on the Class 1 felony based on the jury's finding of exceptionally brutal or heinous behavior. In support, the State cited *People v. Holman*, 2014 IL App (3d) 120905, which stated, "Some behavior is so much more brutal or so much more heinous and so clearly indicative of wanton cruelty that it qualifies a defendant for extended term if it—even if the

15

predicate offense is used to base that upon." For example, if a defendant punches me in the nose, it is a Class A battery. If the defendant punches me in the nose because I'm a police officer, it is a Class 2 felony. If the defendant punches me in the nose to the point that it drives my nose up into my head for serious damage, the Class 2 felony could be enhanced to extended term sentencing. The State then said,

> "Judge, when we looked at this, we were scared to death that we could only sentence [defendant] to 15 years at 50 percent. The state's attorney said that's not— that's not going to make it. You figure out a way to do something to increase that, because seven and a half years isn't enough for what this man did. *** It broke our hearts. From day one, the direction from the state's attorney is the maximum sentence possible, figure out a way to get it done."

¶ 43 It claimed the legislature could not have possibly intended that aggravated battery amounting to torture is capped at 15 years' imprisonment to be served at 50%. It argued, "The gravity of this crime, the gravity of the injury, the brutality, the ongoing for the rest of his life suffering of everyone that's associated with [Robert] can't be tolerated with a slap on the wrist."

¶ 44 Defense counsel argued defendant was not subject to extended term sentencing on the Class 1 felony conviction. He stated that wanton cruelty was defined as consciously seeking to inflict pain and suffering on the victim of the offense. Torture, as stated in the aggravated battery statute, was defined as the infliction of, or subjection to, extreme physical pain motivated by an intent to increase or prolong the pain, suffering, or agony of the victim. Counsel contended that the meaning of torture, brutal, and cruel overlap. When there is an overlap, there is some ambiguity, which was resolved in the favor of defendant. He argued the terms were so intertwined that you cannot separate them. As such, defense counsel contended the court could not enhance the aggravated

16

battery charge to a Class 1 felony based on torture and then again enhance it to an extended term Class 1 felony based on wanton cruelty. Counsel argued that the State's claim that the legislature could not have intended aggravated battery based on torture to be limited to 4 to 15 years' imprisonment at 50% was incorrect because that was exactly what they did. Defense counsel said the State's authority on this point was distinguishable as it had different facts. Defense counsel contended that a 4-to-15-year sentencing range was therefore applicable for the Class 1 felony.

¶ 45 Defense counsel requested a lower minimum end of the sentencing range. Counsel argued there would be a detrimental hardship on defendant's family with a lengthy prison sentence. Defendant was a productive member of society, running his own business, and being employed pretty much his entire adult life. Counsel acknowledged defendant had criminal history but contended this was defendant's first felony.

¶ 46 The court stated it considered all the evidence, PSI report, victim impact statements, and factors in aggravation and mitigation. It found defendant's failure to give a statement in allocution disturbing and disappointing, but noted he had a right to say nothing. The court determined count I merged with count II, but found the intimidation conviction was a separate offense from the Class 1 aggravated battery felony based on torture. It agreed with the State that defendant was extended term eligible, and his conduct caused or threatened serious harm. The court stated there was plenty of reason to impose an extended term sentence because of the brutality and heinous nature of the crime. It further stated, "It was a specific finding by the jury, it was an element of the crime, and I think as such can be used to extend term the sentence." The court also determined that the Class 1 felony was accompanied with serious bodily injury, which triggered the mandatory consecutive sentencing. It sentenced defendant to 30 years' imprisonment on the Class 1 felony aggravated

17

battery along with a $25,000 fine and 5 years' imprisonment for intimidation with another $25,000 fine, with the sentences running consecutively.

¶ 47 The court stated,

"The clerk is entitled to a $500 bond fee and she will get just that; however, our normal policy with regard to our getting our fine money first and the victim getting restitution later will be reversed. I'm going to ask the clerk to respectfully manually enter into the computer that [the victim] will get $4,500, which is all I have left of the $5,000 [bond] in restitution, to apply towards the $4,718.87 that he is out of pocket. With regard to [Robert's] future expenses, I find them at this point to be too speculative.*** It's going to be a while before [defendant] can get out and pay anything towards the fine and/or restitution anyway. So I'll let civil law take control of any future expenses that [the victim] is out."

¶ 48 The court entered judgment on June 26, 2019. It reflected defendant was sentenced to 30 years' imprisonment for aggravated battery based on torture and 5 years' imprisonment for intimidation. The sentences were to run consecutively. Defendant's conviction for count I was merged with count II. The judgment also stated defendant was assessed $25,000 for fines and costs for count II and $25,000 for count III. It further stated, "Defendant is ordered to pay restitution to Robert Pfister in the amount $4,718.87; the Clerk shall keep 10% of bond posted ($500.00) and shall pay to Robert Pfister the sum of $4,500.00 towards restitution as ordered before payment of total fine and costs."

¶ 49 On July 12, 2019, defendant filed a motion to reconsider sentence. Defendant argued— *inter alia*—that he was not eligible for extended term sentence on the Class 1 felony aggravated

18

battery and both sentences were excessive and unjustified based on the evidence and arguments presented by counsel in aggravation and mitigation at the sentence hearing.

¶ 50    At the hearing on the motion to reconsider, defense counsel stood on the arguments made at the sentencing hearing and as alleged in the motion. The State also stood on its previous arguments and motions. The court found it heard or read nothing to change its mind and denied the motion.

¶ 51                                II. ANALYSIS

¶ 52    Defendant's arguments on appeal pertain only to his sentence. He believes that his 30-year sentence on his aggravated battery conviction based on torture violates *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and is improper double enhancement. Defendant also asserts errors in the court's fines and restitution order.

¶ 53                            A. *Apprendi* Claim

¶ 54    Defendant first contends that the imposition of an extended term sentence on his aggravated battery based on torture conviction violated *Apprendi*. This issue, however, is forfeited where defendant failed to argue it before the trial court. *People v. Hillier*, 237 Ill. 2d 539, 544 (2010) ("[T]o preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required."). Defendant asserts this issue can be reviewed for plain error.

¶ 55    Plain error allows this court to consider forfeited errors that are clear, obvious, and affect substantial rights. Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). In the sentencing context, defendant must show there was clear and obvious error and "(1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing."

19

*Hillier*, 237 Ill. 2d at 545. Defendant has the burden of persuasion under both prongs of plain error and the failure to meet the burden results in honoring the procedural default. *Id.*

¶ 56 Here, defendant argues plain error is applicable because the alleged error affects his fundamental right to liberty. It is questionable that defendant argued for either prong of plain error as he fails to explicitly specify whether the alleged error constitutes first or second prong plain error. In support of his contention that plain error is applicable, defendant cites to—*inter alia*—*People v. Abdelhadi*, 2012 IL App (2d) 111053, ¶¶ 7, 19-20, which noted that second prong plain error potentially applies in cases where the court considered an improper factor and reversed the trial court after finding it considered an improper factor in sentencing. As such, it is possible defendant contends we may review this issue under second prong plain error. However, our supreme court has already established that an *Apprendi* violation is not structural error subject to second prong plain error. See *People v. Nitz*, 219 Ill. 2d 400, 411-13 (2006); *People v. White*, 2011 IL App (1st) 092852, ¶ 91. Because defendant failed to alternatively argue under the first prong of plain error, he failed to meet his burden under either prong. Therefore, we honor the procedural default of this issue. *Hillier*, 237 Ill. 2d at 545-46.

¶ 57                              B. Double Enhancement Claim

¶ 58 Defendant next argues that the extended term sentence imposed on the aggravated battery based on torture conviction was the result of improper double enhancement for two reasons. We address each in turn.

¶ 59 "It is well settled that the trial court has broad discretionary powers in imposing a sentence [citation], and the trial court's sentencing decision is entitled to great deference [citation]." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). Although a court has broad discretion in sentencing, it may not engage in double enhancement. See *People v. Phelps*, 211 Ill. 2d 1, 11-12 (2004). " 'A double

20

enhancement occurs when either (1) a single factor is used both as an element of an offense and as a basis for imposing a harsher sentence than might otherwise have been imposed, or (2) the same factor is used twice to elevate the severity of the offense itself.' " *People v. Guevara*, 216 Ill. 2d 533, 545 (2005) (citing *Phelps*, 211 Ill. 2d at 11-13).

¶ 60    Defendant first contends that the court engaged in improper double enhancement by relying on the jury's finding of brutal and heinous behavior indicative of wanton cruelty that was made in connection with his aggravated battery based on great bodily harm conviction to make defendant eligible for extended sentencing on his aggravated battery based on torture conviction. He explains that the definitions of brutal, heinous, wanton cruelty, and torture overlap and are indistinguishable. According to defendant, torture necessarily involves brutal or heinous behavior indicative of wanton cruelty, and therefore, the latter cannot be relied upon to impose an extended term sentence on an aggravated battery based on torture conviction.

¶ 61    The State contends the finding of brutal or heinous conduct was not dependent upon a finding of torture, and it was factually and legally possible for the jury to have found both or either brutal or heinous conduct while acquitting defendant of the offense based on torture. It explains a finding of "torture" could qualify as conduct that is brutal and heinous and indicative of wanton cruelty, but it is not necessarily the case that the jury's finding of brutal or heinous conduct was based on the same consideration as torture where defendant's conduct could be considered exceptionally brutal or heinous on a multitude of grounds. For example, the jury could have found brutal or heinous behavior indicative of wanton cruelty based on defendant's premeditation, the senselessness of the act, or whether defendant inflicted mental distress on the victim. *People v. Holman*, 2014 IL App (3d) 120905, ¶ 63. We agree.

¶ 62    In order for the court to impose extended sentencing here, defendant's conduct must be both (1) exceptionally brutal or heinous and (2) indicative of wanton cruelty. *Nitz*, 219 Ill. 2d at 418. Brutal behavior means "grossly ruthless, devoid of mercy or compassion; cruel and cold-blooded." (Internal quotation marks omitted.) *Id.* Heinous behavior means "hatefully or shockingly evil; grossly bad; enormously and flagrantly criminal." (Internal quotation marks omitted.) *Id.* "Wanton cruelty requires proof that the defendant consciously sought to inflict pain and suffering on the victim of the offense." (Internal quotation marks omitted.) *Id.* Under the aggravated battery statute, torture is defined as "the infliction of or subjection to extreme physical pain, motivated by an intent to increase or prolong the pain, suffering, or agony of the victim." 720 ILCS 5/12-3.05(h) (West 2018).

¶ 63    The above definitions are similar, but they do not always overlap. Courts have considered torture in determining whether behavior is exceptionally brutal or heinous and indicative of wanton cruelty (*Holman*, 2014 IL App (3d) 120905, ¶ 63), but torture or prolonged pain is not required to find brutal or heinous behavior. *Id.* ¶ 64; see *Nitz*, 219 Ill. 2d at 418 ("Brutal or heinous behavior generally involves prolonged pain, torture, or premeditation [citation], but does not necessarily require them [citation]."); *People v. La Pointe*, 88 Ill. 2d 482, 501 (1981). Considerations to determine whether behavior is exceptionally brutal or heinous indicative of wanton cruelty include: "whether the offense was premeditated, whether the defendant was provoked to act, the senseless nature of the act, the number of wounds inflicted, the danger created by the act, the extent of the injury inflicted, whether the defendant exhibited remorse, whether the defendant inflicted prolonged pain or torture, whether defendant shot the victim at close range, and whether defendant inflicted mental suffering on the victim." *Holman*, 2014 IL App (3d) 120905, ¶ 63. The fact that torture and exceptionally brutal or heinous behavior indicative of wanton cruelty do not always

22

overlap indicates they are two separate bases for enhancing a sentencing range. See *People v. Taylor*, 2023 IL 128316, ¶¶ 61-62 (stating that in cases of attempted murder, it is evident that sentencing enhancement for when victim is a peace officer, fireman, emergency medical technician, or emergency management worker addresses separate evil from firearm enhancements where the statutory sections do not always overlap).

¶ 64    Moreover, the fact torture is an element subjecting defendant to a higher sentencing range does not mean the consideration of torture in determining whether conduct is exceptionally brutal or heinous indicative of wanton cruelty results in double enhancement. For example, although injury or harm—another consideration in determining whether conduct is brutal or heinous indicative of wanton cruelty—is an element involved in aggravated domestic battery and murder cases, courts have still subjected defendants to extended sentencing based on brutal or heinous behavior indicative of wanton cruelty. *Holman*, 2014 IL App (3d) 120905, ¶ 64; *People v. Errichetto*, 2023 IL App (3d) 210161-U, ¶ 22; *La Pointe*, 88 Ill. 2d at 501. Harm being an element of an offense (such as aggravated battery, murder, etc.) has therefore never removed the possibility that a defendant may be subjected to extended term sentencing for such offense based on exceptionally brutal or heinous behavior indicative of wanton cruelty.

¶ 65    This is not to say that a finding of brutal or heinous behavior indicative of wanton cruelty may be based on solely the elements of the crime. See *People v. Davis*, 121 Ill. App. 3d 916, 921 (1984) (where court found the offense brutal and heinous because defendant intended to kill, it improperly relied on conduct inherent in the offense of attempted murder). Rather, the fact that an element of an offense is a listed consideration in such determination does not remove the possibility that brutal and heinous behavior indicative of wanton cruelty could be found in a case. Stated another way,

23

"Defendant believes the conduct which comprises the offense is not sufficient to allow the court to find the defendant should qualify for extended term. However, if that reasoning is followed, then, for example, a defendant convicted of murder could never qualify for extended term based on the act of the murder, no matter how outrageous. This is not true. [Citations.]

Some behavior is so much more brutal or heinous and so clearly indicative of wanton cruelty that it qualifies a defendant for extended term even if it is the predicate act of the offense." *People v. Yarbrough*, 156 Ill. App. 3d 643, 648 (1987).

¶ 66    "When assessing the brutality and heinousness of a crime, the trier of fact must consider all of the facts surrounding the incident in question, and each case must be decided on its own facts." *Holman*, 2014 IL App (3d) 120905, ¶ 63. The evidence in this case showed conduct beyond that necessary to prove the elements of torture (*i.e.*, the infliction of extreme physical pain and intent to increase or prolong the pain, suffering, or agony of the victim). Defendant's behavior was unprovoked, irrational, and inflicted two major injuries that completely altered the victim's way of life. Defendant stopped attacking Robert only after a car came upon the scene and honked its horn. Moreover, defendant left Robert with no way to leave or obtain help other than the hope that someone would drive by or hear him yell out. As such, we find the evidence supported the finding of exceptionally brutal or heinous behavior indicative of wanton cruelty beyond the infliction of pain and intent to prolong the victim's pain as required by the aggravated battery based on torture statute. The court therefore did not improperly engage in double enhancement on this basis.

¶ 67    Defendant also asserts the court considered an improper aggravating factor—conduct caused or threatened serious harm—that was inherent in the offense of aggravated battery. This

24

issue was not raised below and is therefore forfeited. *People v. Stewart*, 2022 IL 126116, ¶ 11 (where a defendant fails to object to a sentencing error in the trial court and raise it in a postsentencing motion, the error is forfeited).

¶ 68    Defendant asserts this issue can be reviewed for plain error, but again, it is questionable whether defendant argued for either prong of plain error as he fails to explicitly specify whether the alleged error constitutes first or second prong plain error. In support of his contention that plain error is applicable, defendant again cites to—*inter alia*—*Abdelhadi* and so we presume defendant contends this is second prong plain error.

¶ 69    Nevertheless, we find defendant failed to establish plain error because there was no clear or obvious error. *Hillier*, 237 Ill. 2d at 545 (to obtain relief under plain error, "defendant must first show that a clear or obvious error occurred"). Defendant argues that great bodily harm is an element of aggravated battery and, as such, the court could not rely on the aggravating factor of causing or threating serious bodily harm in sentencing him. See 720 ILCS 5/12-3.05(a)(1) (West 2018); 730 ILCS 5/5-5-3.2(a)(1) (West 2018). While the trial judge cannot consider factors implicit in the offense, the rule of double enhancement is not meant to be rigidly applied "because public policy dictates that a sentence be varied in accordance with the circumstances of the offense." *People v. Sanders*, 2016 IL App (3d) 130511, ¶ 13. The court may consider "the nature and circumstances of the offense, including the nature and extent of each element of the offense as committed by the defendant." (Internal quotation marks omitted.) *People v. Saldivar*, 113 Ill. 2d 256, 268-69 (1986); *People v. Rennie*, 2014 IL App (3d) 130014, ¶ 29.

¶ 70    Because a wide range of conduct and harm could constitute aggravated battery, the court was required to consider the extent of the harm and "the manner in which it was inflicted." *Holman*, 2014 IL App (3d) 120905, ¶ 70. "The court may properly consider the extent of the victim's

25

injuries in sentencing where they exceed the required level for the element of great bodily harm." *People v. Roberts*, 2021 IL App (1st) 181190-U, ¶ 38 (citing *People v. Rader*, 272 Ill. App. 3d 796, 808 (1995)); accord *Saldivar*, 113 Ill. 2d at 269. The evidence presented at the sentencing hearing demonstrated more than harm inherent in the offense. The State presented evidence regarding the severe, permanent injury to both of the victim's eyes with long-lasting impact on practically every area of his life, affecting him not only physically but also mentally. While the judge's reference to the factor of harm or threat to cause harm was a brief mention with no detailed explanation, we presume the judge acted in accordance with the law (*People v. Howery*, 178 Ill. 2d 1, 32 (1997)) and defendant has shown nothing to rebut that presumption. Accordingly, we find the court did not engage in improper double enhancement. See *People v. Schumann*, 2022 IL App (2d) 210485-U, ¶¶ 19-20.

¶ 71                                    C. Restitution

¶ 72    Regarding restitution, defendant asserts the court made two errors. First, he contends the court failed to consider his future ability to pay any fine or restitution before imposing fines and restitution. Second, he asserts the court failed to fix a period within which payment was to be paid and whether the restitution should be paid in a single payment or installments. The State agrees that the court made these two errors and further contends that the court violated section 5-5-6(e) of the Unified Code of Corrections (730 ILCS 5/5-5-6(e) (West 2018)) by allowing the clerk to apply $4500 of defendant's bond to restitution before paying his fines.

¶ 73    Whether an order imposing restitution and fines is statutorily authorized is reviewed *de novo*. *People v. Felton*, 385 Ill. App. 3d 802, 805 (2008); *People v. Millsap*, 2012 IL App (4th) 110668, ¶ 23. Section 5-5-6(f) of the Unified Code of Corrections requires the court to take into consideration defendant's ability and determine whether restitution shall be paid in a single

payment or in installments and shall fix a period of time not in excess of five years within which payment is to be paid in full. 730 ILCS 5/5-5-6(f) (West 2018). "Compliance with this statute is mandatory." *People v. Hamilton*, 198 Ill. App. 3d 108, 116 (1990), *rev'd in part on other grounds by People v. Williams*, 149 Ill. 2d 467 (1992). If a judge fails "to specify a particular time [for payment], the restitution order is fatally incomplete." *In re Estate of Yucis*, 382 Ill. App. 3d 1062, 1067 (2008). An order that fails to fix the manner of payment, lump sum or installments, is similarly deficient. *People v. Hayes*, 173 Ill. App. 3d 1043, 1052 (1988).

¶ 74   The court here made no mention of when defendant needed to pay the restitution in full. Similarly, it failed to determine whether the manner of payment should be lump sum or installments. The court therefore erred in failing to comply with section 5-5-6(f).

¶ 75   We note this error is forfeited as defendant failed to raise it before the trial court. *Hillier*, 237 Ill. 2d at 544 ("[T]o preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required."). Defendant argues that this court can review the error as second prong plain error. At least one court has found second prong plain error under these circumstances. *People v. Boots*, 2022 IL App (2d) 200640, ¶ 53 (second prong error to fail to set a deadline for payment of restitution). Despite the State noting that defendant forfeited this issue, it does not argue plain error is inapplicable. Because "the State has not argued against plain error review[, it has] forfeited that argument." *People v. Murphy*, 2017 IL App (1st) 142092, ¶ 16. Without the issue being fully briefed by both parties, we decline to address whether failure to comply with section 5-5-6(f) constitutes second prong plain error. *Murray v. Chicago Youth Center*, 224 Ill. 2d 213, 244 (2007); *Illinois State Toll Highway Authority v. Chicago Title Land Trust Co.*, 2023 IL App (1st) 221119-U, ¶ 35.

¶ 76    With that said, " ' "forfeiture is a limitation on the parties and not the reviewing court, and we may overlook forfeiture where necessary to obtain a just result or maintain a sound body of precedent." ' " *People v. Acosta*, 2024 IL App (2d) 230475, ¶ 15 (quoting *People v. Wetzel-Connor*, 2023 IL App (2d) 230348-U, ¶ 26, quoting *People v. Holmes*, 2016 IL App (1st) 132357, ¶ 65). This error creates not only confusion and possible unfairness to defendant (see 730 ILCS 5/5-5-6(b) (West 2018) (the failure to pay restitution as specified by the court may result in seizure of defendant's real or personal property)), but it also leaves the victim in a precarious situation. Making the victim whole is one purpose of restitution (*Boots*, 2022 IL App (2d) 200640, ¶ 54). "Without a deadline for the payment of restitution, the defendant could not be found delinquent in failing to pay. Without a delinquency, a crime victim could not enforce a restitution judgment." *Id.* We therefore overlook defendant's forfeiture to obtain a just result and remand on this basis.

¶ 77    While we remand so that the court can comply with section 5-5-6(f), we note the court also failed to comply with section 5-5-6(e), which provides, "The court may require the defendant to apply the balance of the cash bond, after payment of court costs, and any fine that may be imposed to the payment of restitution." 730 ILCS 5/5-5-6(e) (West 2018). Thus, under section 5-5-6(e), "restitution may be paid using a defendant's bond money *only after* the bond money is first applied to satisfy the fines and costs imposed." (Emphasis in original.) *People v. Higgins*, 2014 IL App (2d) 120888, ¶ 13. The court here ordered that defendant's cash bond be applied to restitution before his fines were paid. While we sympathize with the trial court trying to provide some compensation to Robert, it was required to comply with section 5-5-6(e).

¶ 78    The court also did not comply with section 5-9-1(d)  of the Unified Code of Corrections (730 ILCS 5/5-9-1(d) (West 2018)). In imposing a fine, the court is statutorily required to consider "the financial resources and future ability of the offender to pay the fine" and "whether the fine

28

will prevent the offender from making court ordered restitution or reparation to the victim of the offense." *Id*. The consideration of defendant's financial resources and future ability to pay must be affirmatively shown by the record. *People v. Maldonado*, 109 Ill. 2d 319, 324 (1985). Here, there was information of defendant's employment in the PSI report, but the court did not refer to defendant's employment or any other facts relating to defendant's future ability to pay during the sentencing hearing or during its imposition of fines.

¶ 79    As such, we remand for a new hearing regarding fines and restitution based on the court's noncompliance with section 5-5-6(f). During the new hearing, the court should also comply with section 5-5-6(e) and section 5-9-1(d), and all other applicable statutes.

¶ 80                                  III. CONCLUSION

¶ 81    Defendant failed to establish plain error for his *Apprendi* claim, and the court did not engage in improper double enhancement. However, the court failed to comply with section 5-5-6(f) of the Unified Code of Corrections (730 ILCS 5/5-5-6(f) (West 2018)). Accordingly, we affirm the judgment and sentence but remand for a new hearing regarding only fines and restitution so that the court can comply with section 5-5-6(e) and (f) and section 5-9-1(d) of the Unified Code of Corrections (*id.* §§ 5-5-6(e), (f); 5-9-1(d)), and all other applicable statutes.

¶ 82    Affirmed and remanded with directions.